Present:  All the Justices

IVAN TELEGUZ

v.  Record No. 062085     OPINION BY JUSTICE ELIZABETH B. LACY
                                    April 20, 2007
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
John J. McGrath, Jr., Judge

Ivan Teleguz was convicted by a jury of the capital murder for hire of Stephanie Yvonne Sipe in violation of Code § 18.2-31(2) and sentenced to death.  We consolidated the automatic review of Teleguz's death sentence with the appeal of his capital murder conviction pursuant to Code § 17.1-313(F).  For the reasons stated below, after consideration of the issues raised by Teleguz and our mandated review of the imposition of the death penalty, we will affirm the judgment of the trial court.

I.  FACTS AND PROCEEDINGS

We recite the facts in the light most favorable to the Commonwealth, the prevailing party below.[1]  Remington v. Commonwealth, 262 Va. 333, 338, 551 S.E.2d 620, 624 (2001), cert. denied, 535 U.S. 1062 (2002).  During the summer of 2001, Teleguz hired Edwin Lee Gilkes, Jr., and Michael Anthony Hetrick to kill Sipe, who was Teleguz's ex-girlfriend and the

---

[1] Facts relevant only to specific issues raised by Teleguz will be recited in conjunction with the discussion of those issues.

mother of his young child. On July 21, 2001, Teleguz, driving his car, took Gilkes and Hetrick from their apartment in Lancaster, Pennsylvania, to Harrisonburg, Virginia, where Sipe lived. Teleguz told Hetrick he wanted Sipe's "throat cut" and "to make sure she was dead." Once in Virginia, Teleguz waited in the car while Gilkes and Hetrick went into a Wal-Mart. Hetrick purchased a fillet knife, which Teleguz approved as a suitable murder weapon. Teleguz took the men to Sipe's apartment complex and pointed out her apartment. They then drove the car to a parking lot near Sipe's residence, where Gilkes and Hetrick got out of the car. Teleguz told the men to "wait until he had time to get back to Pennsylvania."

After waiting several hours, Gilkes and Hetrick walked back to Sipe's apartment complex. Hetrick approached Sipe's apartment alone and gained entry by asking to use the telephone. Once in the apartment, Hetrick killed Sipe by cutting her throat. In the course of the attack, Hetrick injured his hand. Hetrick went to the bathroom to clean his hand and was surprised to find Sipe's infant son "in the bathtub with the water running." Hetrick turned off the water and left the apartment. Gilkes and Hetrick returned to Pennsylvania by bus.

On the evening of July 23, 2001, Sipe's mother, Pamela Y. Woods, went to her daughter's apartment because she had not

2

heard from Sipe during the previous two days and was unable to reach her by telephone.  When Woods entered the apartment, she found Sipe's body in the front room and began screaming for help.  Woods then found Sipe's twenty-three month-old son in the bathroom of the apartment, with the bathtub full of water.  The child was unharmed.  In response to Woods' screams, Mark Edwin Moore, a neighbor, went to Sipe's apartment and, after placing a blanket over Sipe's body, took Woods and her grandson out of the apartment.

The medical examiner testified that Sipe suffered a number of cuts described as defensive wounds, as well as three other wounds.  The first, according to the medical examiner, was a superficial wound.  The second wound was a "stabbing wound," which affected the area "all the way from the left side of the neck . . . to the right side of the neck" and consisted of a cut to Sipe's windpipe and esophagus.  The medical examiner also testified that the third wound, the fatal wound, was a "cutting wound" which consisted of a cut approximately two and one-half inches deep into Sipe's trachea, larynx, and a major artery on the right side of Sipe's neck, which was completely severed.

At the crime scene, the Harrisonburg police discovered blood that did not belong to Sipe.  Investigator Kevin A. Whitfield learned from Sipe's family members that Teleguz was

3

the father of Sipe's son and that he was currently living in Pennsylvania. Investigator Whitfield also learned that relations between Sipe and Teleguz had been strained, and that Teleguz was upset about a court order requiring him to pay child support. On July 24, 2001, Investigator Whitfield interviewed Teleguz at Teleguz's residence in Pennsylvania. Teleguz denied any involvement in the murder, and stated he had been in Pennsylvania since July 20, 2001.

On December 14, 2001, Investigator Whitfield, assisted by Pennsylvania State Police, executed a search warrant on Teleguz. Police collected samples of Teleguz's blood, hair, and saliva. Testing revealed that Teleguz was not the source of the blood found at Sipe's apartment.

Also in 2001, Investigator Whitfield interviewed Mark Moore who told Whitfield that he had seen an unknown person around Sipe's apartment prior to her murder. When shown a photograph array that included a photograph of Teleguz, Moore told Investigator Whitfield he was about 70 percent certain Teleguz was the person he had seen at Sipe's apartment. Investigator Whitfield also interviewed Ryan Ferguson, who was with Moore the night he saw the individual leave Sipe's apartment. Ferguson was also shown a photograph array. Although Ferguson initially failed to identify Teleguz, he subsequently identified the photograph of Teleguz as the one

4

which "most" resembled the person he had seen leaving Sipe's apartment.  No arrests were made on the basis of these interviews.

The investigation stalled until February 2003, when Michael Nelson, a deputy marshal with the United States Marshal Service, contacted Investigator Whitfield with information about the Sipe murder.  Aleksey Safanov, who was facing federal criminal charges, told Deputy Marshal Nelson that Teleguz had hired a black male from Lancaster, Pennsylvania, to kill Sipe because Teleguz was angry about having to pay child support.  According to Safanov, Teleguz said that Sipe had been murdered, and that Teleguz was upset because "[w]hoever killed her left blood evidence."  Safanov also told investigators that after Sipe's murder, Teleguz wanted to rob Sipe's parents, and that he and Teleguz had driven to Harrisonburg but ultimately did not commit the robbery.

Safanov's information led the police to Edwin Gilkes who told the police that he refused Teleguz's offer to murder Sipe for pay but that Michael Hetrick accepted the offer.  The police then contacted Hetrick who ultimately confessed to murdering Sipe.  Hetrick said Teleguz had hired him to kill Sipe for $2,000, with half to be paid before the murder.  When Teleguz received confirmation of Sipe's death, he paid Gilkes

and Hetrick the remaining $1,000 plus an additional $500 for expenses. Subsequent testing revealed that Hetrick was the source of the unidentified blood found at Sipe's apartment.

As a result of Hetrick's confession, Teleguz was arrested in Pennsylvania on July 1, 2004 and subsequently extradited to Virginia. He was indicted by a Rockingham County grand jury for the willful, deliberate, and premeditated killing of a person by another for hire as an accessory before the fact in violation of Code § 18.2-31(2).

Following a four day trial, the jury found Teleguz guilty as charged. The jury proceeded to hear further evidence regarding sentencing. The Commonwealth presented evidence at sentencing in support of the statutory aggravators of vileness and future dangerousness. In addition to the evidence presented during the guilt portion of the trial, the Commonwealth's evidence included Teleguz's prior criminal convictions, testimony from Sipe's relatives, the nature of the injuries Sipe sustained, and the pain she would have experienced prior to her death. Teleguz presented mitigation evidence including testimony about his background and childhood in the Ukraine. He presented testimony about his lack of disciplinary infractions while incarcerated. The jury found both statutory aggravators beyond a reasonable doubt and recommended a sentence of death.

Teleguz filed a number of post-trial motions, including a motion to compel disclosure of information he asserted was improperly suppressed.  He then moved to set aside the verdict, arguing that the Commonwealth's suppression of exculpatory evidence violated his due process rights under Brady v. Maryland, 373 U.S. 83 (1963).  The trial court denied the motion, finding that the evidence allegedly suppressed was not material to the issue of Teleguz's guilt and therefore no Brady violation occurred.  The trial court also rejected the other grounds on which Teleguz sought to have the verdict set aside and declined to set aside the sentence of death and impose a life sentence pursuant to Code § 19.2-264.5.  Teleguz appealed, asserting 35 assignments of error.

## II.  ANALYSIS

### A.  ASSIGNMENTS OF ERROR WAIVED OR ABANDONED

#### 1.  Juror 50

Teleguz argues that the trial court's failure to strike Juror 50 for cause was error because she stated she could not consider information about Teleguz's background as mitigating evidence.  This argument is a new argument not presented to the trial court.  At trial, Teleguz argued that Juror 50 should have been removed from the venire due to a potential scheduling conflict involving the juror's child.  Accordingly, we will not consider this argument raised for the first time

7

on appeal. Rule 5:25; Goins v. Commonwealth, 251 Va. 442, 463, 470 S.E.2d 114, 128, cert. denied, 519 U.S. 887 (1996).

## 2. Comments Made in Opening Statement

Teleguz asserts that the trial court erred in denying his "mistrial motions" based upon comments made by the Commonwealth during opening statements. The first comment was that Teleguz gave "no reaction" when told by the police about Sipe's murder, and that he did not ask about his son. The second comment referred to expected testimony of Teleguz's brother, Pavel Teleguz.

A review of the record demonstrates that the trial court never denied a motion for mistrial with regard to either statement because no such motions were made. Although the trial court sustained Teleguz's motion in limine to exclude any evidence regarding his precustodial silence, Teleguz did not object, ask for a cautionary instruction, or move for a mistrial in conjunction with the Commonwealth's reference to precustodial silence in its opening statement. While Teleguz did object to the Commonwealth's comments regarding Pavel Teleguz's testimony, he did not request a mistrial. Teleguz only commented, "I don't think we should risk a mistrial based on that" before the trial court overruled the objection. Accordingly, these assignments of error do not address a

ruling made by the trial court and we do not consider them.[2] Rule 5:17(c); Rawls v. Commonwealth, 272 Va. 334, 344, 634 S.E.2d 697, 701 (2006).

### 3. Motion for Continuance

Teleguz argues that the trial court should have granted a motion for continuance raised when Investigator Whitfield testified regarding Moore's identification of Teleguz. The record shows that during this testimony, Teleguz asked for a "mistrial or at least a continuance" to allow him to find and question Moore. The trial court denied the motion for a mistrial but never ruled on the continuance request, and Teleguz did not seek a ruling on his motion for a continuance.

Because this assignment of error does not address any ruling made by the trial court, we do not consider it. Rule 5:17(c); Riner v. Commonwealth, 268 Va. 296, 325, 601 S.E.2d 555, 571-72 (2004); Lenz v. Commonwealth, 261 Va. 451, 462-63, 544 S.E.2d 299, 305-06, cert. denied, 534 U.S. 1003 (2001).

### 4. Pavel Teleguz Testimony

Teleguz claims that the trial court's decision to permit Pavel Teleguz to testify as a hostile witness was error because it allowed the Commonwealth to use an investigator's

---

[2] On brief Teleguz also complains of a comment made by the Commonwealth during the penalty phase. Teleguz has not assigned error to this comment and accordingly we do not consider it here. Rule 5:17(c).

9

notes for impeachment in violation of the Confrontation Clause of the United States Constitution, U.S. Const. amend. VI.

The only argument submitted by Teleguz in this Court in support of this claim was a single sentence that the use of the investigator's notes in questioning Pavel Teleguz was "wholly improper." Because Teleguz has failed to brief this assignment of error, it is abandoned. Rule 5:17(c); Muhammad v. Commonwealth, 269 Va. 451, 478-79, 619 S.E.2d 16, 31 (2005), cert. denied, ___ U.S. ___, 126 S.Ct. 2035 (2006); Elliott v. Commonwealth, 267 Va. 396, 422, 593 S.E.2d 270, 286 (2004), cert. denied, 543 U.S. 1081 (2005).

## 5. Driving Time Testimony

Teleguz claims that the trial court erred in allowing testimony from Investigator Whitfield regarding the driving time between Teleguz's residence in Pennsylvania and the crime scene in Harrisonburg because such testimony was irrelevant and prejudicial. Teleguz did not raise these arguments at trial. Instead, Teleguz argued that the testimony should not be admitted because it described "an experiment."

We will not consider this new argument because it was not presented to the trial court. Rule 5:25; Goins, 251 Va. at 463, 470 S.E.2d at 128.

## 6. Pamela Woods Testimony

At trial, Pamela Woods testified, over Teleguz's objection, that Teleguz had asked Sipe to "go with him" but to leave their son behind. Teleguz argues that this testimony was "irrelevant and prejudic[ial]" and its admission was reversible error. At trial, Teleguz objected to this testimony on relevancy and hearsay grounds. The trial court sustained the hearsay objection but never ruled on the relevancy objection. Because the trial court did not issue a ruling on Teleguz's relevancy objection, there is no basis upon which this Court may consider the issue. Rule 5:17(c); Riner, 268 Va. at 325, 601 S.E.2d at 571-72; Lenz, 261 Va. at 462-63, 544 S.E.2d at 305-06. Finally, we do not consider Teleguz's argument that this testimony was prejudicial, because that argument was not presented to the trial court. Rule 5:25; Goins, 251 Va. at 463, 470 S.E.2d at 128.

### 7. Evidence of a Knife and Gloves

When the Commonwealth sought to elicit testimony about a knife and a pair of gloves found in Teleguz's car shortly after the murder, Teleguz objected, arguing that the knife and gloves had not been connected to the murder and such evidence was therefore irrelevant. The trial court sustained Teleguz's objection finding the evidence "too attenuated and prejudicial." Teleguz subsequently moved for a mistrial and if the mistrial was not granted "to certainly instruct the

11

jury" with regard to the excluded evidence.  The trial court responded by instructing the jury that the knife and gloves were not to be considered as evidence.  Teleguz assigns error to the trial court's failure to grant his motion for a mistrial, arguing the Commonwealth's comments on the knife and gloves tainted the jury.

Based on the record, we conclude that Teleguz has waived this assignment of error.  When the trial court granted the request for the jury instruction, Teleguz raised no objection to the failure to grant the mistrial.  Accordingly, this assignment of error is waived.  Rule 5:25.

## 8.  Photograph Array

Teleguz assigns error to the admission of the photograph array because it was unduly suggestive.  Teleguz's primary argument on this issue is that Moore's identification was unreliable due to the time of the day when Moore stated he saw Teleguz, and the fact that Moore was "using drugs and drinking heavily" when he saw the person leave Sipe's apartment.  Teleguz's argument does not address the grounds on which the error was assigned and only refers to the array as containing "four minorities as 'fillers'" and Teleguz's brother without more.  In the absence of any substantive argument on why the display was unduly suggestive, this assignment of error has been abandoned.  Rule 5:17(c).

12

## 9. Testimony of Kimberly Woods

Teleguz assigns error to the trial court's refusal to accept a stipulation regarding the testimony of Kimberly Woods. On brief, Teleguz argues only that the trial court erred in refusing to grant a continuance to allow Teleguz to secure Woods' attendance at trial. This argument does not relate to the assignment of error and accordingly we do not consider it here. Rule 5:17(c). In the absence of any argument in support of the assignment of error, the assignment of error is abandoned. Rule 5:17(c); see Juniper v. Commonwealth, 271 Va. 362, 414, 626 S.E.2d 383, 416, cert. denied, ___ U.S. ___, 127 S.Ct. 397 (2006).

Teleguz also claims that the trial court erred by refusing to allow Investigator Whitfield to testify regarding Woods' out of court statements. The only argument in support of this assignment of error is a single sentence that reiterates the assignment of error. Such a statement does not constitute an argument in support of the error assigned. Accordingly, this assignment of error is abandoned. Rule 5:17(c); Muhammad, 269 Va. at 478-79, 619 S.E.2d at 31; Elliott, 267 Va. at 422, 593 S.E.2d at 286.

### B. ISSUES PREVIOUSLY DECIDED

13

In three assignments of error, Teleguz raises arguments which have been previously considered and rejected by this Court.

## 1. Conditions of Confinement

Teleguz argues that the trial court erred in denying his motion to present expert testimony and evidence regarding the conditions of incarceration to rebut allegations of future dangerousness.[3] Teleguz's motion was a general motion seeking to present evidence on prison conditions and security and did not address evidence specific to him. Therefore, the trial court did not err in rejecting his motion. Bell v. Commonwealth, 264 Va. 172, 201, 563 S.E.2d 695, 714, cert. denied, 537 U.S. 1123 (2002); and Burns v. Commonwealth, 261 Va. 307, 340, 541 S.E.2d 872, 893, cert. denied, 534 U.S. 1043 (2001).

## 2. Constitutionality of Death Penalty

Teleguz argues that imposition of the sentence of death constitutes reversible error due to the following purported

---

[3] We assume Teleguz is referring to his pretrial motion for the appointment of an expert on prison conditions to rebut allegations of future dangerousness or in the alternative to proffer evidence on such conditions. The record shows that the only other instance in which he sought to introduce such evidence was for the trial court's consideration of prison conditions when determining whether, for good cause shown, the sentence of death recommended by the jury should be commuted to a sentence of life without parole pursuant to Code § 19.2-

constitutional deficiencies of the death penalty statutes and procedures in Virginia.  We find nothing additional in the arguments raised by Teleguz in this case and adhere to our previous holdings.

    (1)  Code §§ 19.2-264.2 through -264.5 fail to adequately direct the jury as to how to evaluate the aggravating factors so as to avoid the arbitrary imposition of the death penalty. Rejected in Wolfe v. Commonwealth, 265 Va. 193, 208, 576 S.E.2d 471, 480, cert. denied, 540 U.S. 1019 (2003), and Mickens v. Commonwealth, 247 Va. 395, 403, 442 S.E.2d 678, 684, vacated and remanded on other grounds, 513 U.S. 922 (1994).

    (2)  Unadjudicated criminal acts should not be considered to prove future dangerousness.  Rejected in Stockton v. Commonwealth, 241 Va. 192, 209-10, 402 S.E.2d 196, 206, cert. denied, 502 U.S. 902 (1991).

    (3)  Hearsay should not be considered in the post-sentence report.  Rejected in O'Dell v. Commonwealth, 234 Va. 672, 701-02, 364 S.E.2d 491, 507-08, cert. denied, 488 U.S. 871 (1988).

    (4)  The death sentence may not be set aside upon a showing of good cause.  Rejected in Breard v. Commonwealth, 248 Va. 68, 76, 445 S.E.2d 670, 675-76, cert. denied, 513 U.S. 971 (1994).

    (5)  Appellate review procedures are not consistent with the Eighth Amendment and other constitutional provisions.  Rejected in Satcher v. Commonwealth, 244 Va. 220, 228, 421 S.E.2d 821, 826 (1992), cert. denied, 507 U.S. 993 (1993) and Smith v. Commonwealth, 239 Va. 243, 253, 389 S.E.2d 871, 876, cert. denied, 498 U.S. 881 (1990).

### C.  PRETRIAL ISSUES

---

264.5.  The trial court granted Teleguz's motion to consider this evidence.

### 1. <u>Juror 66</u>

Teleguz argues that the trial court committed reversible error by failing to remove Juror 66 after the juror indicated he "could not consider Mr. Teleguz's background as mitigating evidence."

During the individual voir dire of a four-juror panel, Teleguz sought to determine whether the jurors would have trouble considering as mitigating evidence in the penalty phase someone's personal experiences if that person came from a very different background, specifically the Soviet Union. However, Teleguz's questions initially were not clearly directed to the penalty phase and referred to Teleguz's country of origin, rather than personal experiences. Juror 66 and another juror clearly were confused by Teleguz's questions. Juror 66, for example, responded that he could not say someone was "guilty because he's from Russia." Although Teleguz attempted to clarify his question, the jurors' confusion about the use of such evidence remained. Juror 66 said that he would not decide a penalty "[b]ased on where [Teleguz] was from." The trial court attempted to clarify the question it believed Teleguz wanted to ask, but the jurors continued to interpret the question as whether they would determine Teleguz's penalty based on his country of origin. The trial court stated that it would take the jurors'

confusion into account when evaluating their answers. Teleguz moved to strike Juror 66 for cause, because of his inability to "consider things in mitigation." The trial court denied Teleguz's motion.

We apply an abuse of discretion standard when we review a trial court's refusal to strike a juror for cause. Spencer v. Commonwealth, 240 Va. 78, 94, 393 S.E.2d 609, 619, cert. denied, 498 U.S. 908 (1990). As we have previously recognized, a trial judge who personally observes a juror, including the juror's tenor, tone, and general demeanor, is in a better position than an appellate court to determine whether a particular juror should be stricken. Id. (citing LeVasseur v. Commonwealth, 225 Va. 564, 584, 304 S.E.2d 644, 655 (1983), cert. denied, 464 U.S. 1063 (1984)).

In this case, the trial court was well aware of the confusion arising from Teleguz's questions, took that confusion into consideration when evaluating the jurors' answers, and concluded that Juror 66 should not be stricken for cause because of an inability to consider mitigating evidence. Based on our review of the record, we conclude the trial court did not abuse its discretion.

### 2. Motion for Change of Venue

Teleguz argues that the trial court should have granted his motion for change of venue because of the media coverage

17

of the trial and because many of the jurors were aware of Sipe's murder through this media coverage.

Teleguz filed a change of venue motion on January 27, 2006. His motion was accompanied by a single article published the day before in a Harrisonburg newspaper, recounting the plea agreement of Gilkes, his willingness to assist in the prosecution, and statements by the prosecutor that Teleguz "wanted [Sipe] dead because he did not want to pay child support." The trial court denied Teleguz's motion, holding that Teleguz failed to meet his burden of overcoming the presumption that he would receive a fair trial in Harrisonburg.

Prior to voir dire, which began on February 6, 2006, Teleguz reasserted his motion for change of venue based on a newspaper article published that morning. Teleguz asked the trial court, if his motion was denied, to question the potential jurors in voir dire regarding their knowledge of the case acquired through the media. The trial court denied the motion for change of venue but stated that it intended to "take up specific issues of publicity" with the jury.

The record reflects that although a number of prospective jurors had learned something about the case from newspapers, radio, or television, only two indicated that they could not put that information "out of their mind[s]" in deciding the

18

merits of the case.  Selection of the jury was completed in one day.  The following morning, prior to empanelling the jury, at Teleguz's request, the trial court asked whether any one had read an article about the trial that appeared in the morning paper.  The panel members responded in the negative.  Teleguz, in response to a question from the trial court, stated that he was satisfied that the jury panel chosen was "free from exception."

In considering a motion for change of venue, we begin with the presumption that a defendant can receive a fair trial in the jurisdiction in which the offense occurred.  Stockton v. Commonwealth, 227 Va. 124, 137, 314 S.E.2d 371, 379-80, cert. denied, 469 U.S. 873 (1984).  The defendant must overcome this presumption by showing that it is reasonably certain a fair trial will be prevented because of the prejudice against the defendant that exists in the community.  Id.  Whether a change of venue should be granted lies within the sound discretion of the trial court.  George v. Commonwealth, 242 Va. 264, 274, 411 S.E.2d 12, 18 (1991), cert. denied, 503 U.S. 973 (1992) (citing LeVasseur v. Commonwealth, 225 Va. at 577, 304 S.E.2d at 651).

The existence of media reports about the accused and the crime does not necessarily require a change of venue.  Buchanan v. Commonwealth, 238 Va. 389, 407, 384 S.E.2d 757,

767-68 (1989), cert. denied, 493 U.S. 1063 (1990). "A potential juror who has knowledge of the case, even if such person has formed an opinion about the case, is entitled to sit on the jury if that opinion can be set aside." Thomas v. Commonwealth, 263 Va. 216, 231, 559 S.E.2d 652, 660 (2002) (citing Irvin v. Dowd, 366 U.S. 717, 722-23 (1961)). In this case, only two examples of media coverage of the trial were offered and no juror was empanelled who voiced any difficulty with ignoring what he or she had learned from the media reports. Furthermore, by conceding that the jury panel was "without exception," Teleguz cannot assert here that he was denied a fair trial because of media coverage. Code § 8.01-352.

Accordingly, the trial court did not abuse its discretion in denying Teleguz's motion for a change of venue.

### 3. Vienna Convention

Teleguz claims that the trial court committed reversible error by denying his motion to strike the death penalty due to a violation of the Vienna Convention. Prior to trial, Teleguz argued that the violation of Article 36 of the Vienna Convention on Consular Relations and Optional Protocol on Disputes, Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820, occurred because the police failed to notify him of his rights under the Vienna Convention, including his right to have the

20

Ukrainian consulate notified of his arrest, until eleven months after his arrest.

The United States Supreme Court has stated that it is "extremely doubtful" that a violation of the Vienna Convention would require a conviction to be overturned absent a showing that the trial was affected by the violation. Breard v. Greene, 523 U.S. 371, 377 (1998). Even if we assumed that a violation occurred in this case, which the trial court did not find, there is no evidence in the record that Teleguz's trial was affected. The trial court granted Teleguz's request for a continuance in order to contact the Ukrainian consulate and rescheduled the trial for approximately six months later in February 2006. The trial court noted that it would entertain any motions from the Ukrainian consulate to replace Teleguz's counsel or for an extension of time should the consulate show that it was willing to assist Teleguz in obtaining evidence from the Ukraine. No such motions were ever filed. Teleguz did not request new counsel from the consulate even though the trial court provided him with two weeks in which to do so. Teleguz did not show that there was any impact on his trial as a result of the delay in being informed of his rights under the Vienna Convention. Accordingly, we reject this assignment of error.

### D. GUILT PHASE ISSUES

#### 1. <u>Testimony of Pavel Teleguz</u>

During the investigation of Sipe's murder, Teleguz's brother, Pavel Teleguz (Pavel), talked with Sergeant Chris Rush of the Harrisonburg Police Department. Sergeant Rush made notes of this interview. At trial, the Commonwealth told the trial court it expected Pavel to be an adverse witness and wanted to question him about statements made in the interview with Sergeant Rush. The Commonwealth told the trial court that if Pavel did not respond as he did in his interview with Sergeant Rush, it intended to question him regarding his inconsistent statements. Pavel testified that he did not recall the substance of his conversation with Sergeant Rush. When he was shown Sergeant Rush's notes, Pavel stated he did not make the statements recorded in the notes. At the Commonwealth's request, the trial court declared Pavel a hostile witness. Teleguz objected, stating, "The fact that the witness doesn't remember does not in fact make him hostile." The trial court overruled Teleguz's objection.

The Commonwealth proceeded to ask Pavel if he heard his brother, the defendant, make certain statements, including a statement about child support. Pavel denied hearing his brother make the statements. Teleguz declined to cross-examine Pavel. The Commonwealth then sought to elicit

22

testimony from Sergeant Rush about the statements which Pavel denied making. The trial court ruled, however, that this would deny Teleguz the right to confront and cross-examine regarding out of court statements. The Commonwealth did not call Sergeant Rush as a witness.

Before Pavel left the courtroom, the Commonwealth stated: "Judge, I would ask that Sgt. Rush come back in and take Mr. Paul Teleguz into custody for perjury." Teleguz moved for a mistrial. The trial court denied Teleguz's motion, stating that the Commonwealth's comment was made out of the hearing of the jury. When Teleguz again raised the issue and asked that the jury be polled to determine if they heard the comment, the trial court denied Teleguz's request and renewed motion for a mistrial, but specifically cautioned the jury that if they had heard any comment following Pavel's release from the witness stand, it was to be disregarded.

### a. Hostile Witness

Teleguz argues that the trial court erred when it allowed the Commonwealth to treat Pavel as a hostile witness. According to Teleguz, Pavel was not a party to the proceeding and no evidence was presented showing that he had any personal or adverse interest in the proceeding.

With respect to the right to attack the testimony of an adverse witness, Code § 8.01-401(A) states, "[a] party called

23

to testify for another, having an adverse interest, may be examined by such other party according to the rules applicable to cross-examination."  This rule applies to any person who has an adverse interest, even if that person is not a party to the litigation.  Hegwood v. Virginia Natural Gas, Inc., 256 Va. 362, 368, 505 S.E.2d 372, 376 (1998) (citing Butler, 186 Va. at 431-32, 43 S.E.2d at 4).  In addition, a person may be considered a hostile witness if his testimony surprises the party who called the person to testify at trial.  See Butler, 186 Va. at 434, 43 S.E.2d at 5.  The rules of cross-examination apply to the examination of a witness who has been deemed hostile or who has an adverse interest.  Code § 8.01-401(A); Butler, 186 Va. at 435, 43 S.E.2d at 6.

We review a trial court's ruling that a witness is a hostile witness under an abuse of discretion standard.  Id. The trial court determines whether a witness is hostile or adverse because "the trial court sees and hears the witness on the stand, observes his demeanor, and hence is in a much better position to determine whether he is in fact adverse or hostile than is an appellate court which must rely on the printed record."  Virginia Electric & Power Co. v. Hall, 184 Va. 102, 105, 34 S.E.2d 382, 383 (1945).

We find no abuse of discretion by the trial court in declaring Pavel a hostile witness because Pavel, as Teleguz's

brother, was a person with an interest adverse to the prosecution. Butler, 186 Va. at 434, 43 S.E.2d at 5 (witness closely connected by blood to accused can have adverse interest).

### b. Comments on Perjury

Teleguz argues that the trial court erred when it denied his motion for a mistrial based on the Commonwealth's request that Pavel be taken into custody for perjury. Teleguz claims that the statement was heard by the jury and that the trial court's instruction to the jury to disregard what it may have heard was insufficient to overcome the prejudice created by the comment.

We find no error by the trial court in its denial of Teleguz's mistrial motion. Regardless of whether the jurors heard the Commonwealth's Attorney's comment, jurors are presumed to follow the instructions provided by the trial court. Muhammad, 269 Va. at 524, 619 S.E.2d at 58 (citing Green v. Young, 264 Va. 604, 611, 571 S.E.2d 135, 139 (2002)). Nothing in the record suggests that the jurors acted otherwise. Accordingly, we reject this assignment of error.

### 2. Reference to "Russian Mafia"

Teleguz filed a motion in limine seeking to preclude the Commonwealth from commenting about or introducing evidence on Teleguz's alleged connection to the "Russian Mafia." The

25

trial court took the motion under advisement, commenting that testimony showing the witnesses' fear of Teleguz because of a relationship with the "Russian Mafia" was appropriate, not for the truth of the matter, but to show the witnesses' state of mind.

At trial, Gilkes and Hetrick each stated that they were afraid of Teleguz because they had heard that he was associated with the "Russian Mafia." Teleguz objected to the statements, relying on his prior motion and also on the grounds that the statements were inadmissible hearsay. The trial court overruled the objections and instructed the jury that the statements were only to be considered to show Gilkes' and Hetrick's states of mind and not for the truth of the matter being asserted.

Teleguz argues that the trial court erred when it allowed Gilkes and Hetrick to testify regarding Teleguz's alleged connections to the "Russian Mafia" because such statements were highly prejudicial. We disagree. The trial court gave a proper limiting instruction and a jury is presumed to follow the instructions given by the trial court. Muhammad, 269 Va. at 524, 619 S.E.2d at 58 (citing Green, 264 Va. at 611, 571 S.E.2d at 139). The instructions provided by the trial court were designed to focus the jury's attention on the specific purpose for which the jurors needed to consider Gilkes' and

Hetrick's statements, namely to show their states of mind in order to explain their actions.  For this reason, the trial court's instructions were adequate to address any prejudice caused by the statements, and eliminated the likelihood that the jury would consider the statements as proof that Teleguz was a member of the "Russian Mafia."  Accord Upchurch v. Commonwealth, 220 Va. 408, 410-11, 258 S.E.2d 506, 508 (1979) (approving decision to admit testimony concerning burglary where jury was properly instructed that testimony was not to be considered for the truth of the matter, but rather to establish foundation on another point).

### 3.  Testimony of Pete Sipe, Jr.

Over Teleguz's objection, the Commonwealth asked the victim's father, Pete J. Sipe, Jr., (Pete Sipe) whether his daughter ever spoke to him "about Ivan paying child support." Pete Sipe testified that his daughter told him Teleguz wanted her to terminate her demand for child support and he was going to try to take their child.

Teleguz argues on appeal that this testimony was hearsay and that the trial court erred in admitting it.  We agree. The witness' testimony consisted of "a narration by one person of matters told him by another."  Techdyn Sys. Corp. v. Whittaker Corp., 245 Va. 291, 300, 427 S.E.2d 334, 340 (1993) (quoting Williams v. Morris, 200 Va. 413, 416-17, 105 S.E.2d

27

829, 832 (1958)).  In the absence of any applicable exception

to the hearsay rule which would have rendered the testimony

admissible, we hold that the trial court erred in admitting

the testimony.  See Scruggs v. Commonwealth, 125 Va. 736, 745-

46, 99 S.E.2d 518, 521 (1919)(holding that testimony regarding

"an alleged conversation of the deceased with a witness (but

not in the presence of the accused)" was hearsay).

We nonetheless conclude, based on our review of the

record, that the error was harmless.  To the extent the

testimony established that Teleguz was upset that he had been

ordered to pay child support to Sipe, it was cumulative, as

this fact was also established through the testimony of other

witnesses.  For this reason, the trial court's admission of

the testimony was harmless error.  Code § 8.01-678.

### 4.  Crime Scene Photographs

Teleguz asserts that the trial court erred by admitting

into evidence graphic photographs of the crime scene and

autopsy because the photographs were prejudicial and inflamed

the passion of the jury.

Accurate photographs of a crime scene are not rendered

inadmissible solely because they are gruesome, and autopsy

photographs of the victim are admissible to show the

atrociousness or vileness of a crime.  Juniper, 271 Va. at

413, 626 S.E.2d at 415-16, Walton v. Commonwealth, 256 Va. 85,

92, 501 S.E.2d 134, 138, <u>cert.</u> <u>denied</u>, 525 U.S. 1046 (1998).

Such photographs must nevertheless be excluded if their

prejudicial effect substantially outweighs their probative

value. <u>Walker v. Commonwealth</u>, 258 Va. 54, 69, 515 S.E.2d

565, 574 (1999), <u>cert.</u> <u>denied</u>, 528 U.S. 1125 (2000). Such

weighing is left to the discretion of the trial court and will

not be disturbed on appeal, absent an abuse of discretion.

<u>Id.</u>

After reviewing the photographs admitted into evidence,

we conclude they were accurate depictions of the crime scene

and autopsy and that the trial court did not abuse its

discretion by admitting them.

E. PENALTY PHASE ISSUES

1. <u>Vileness Statutory Aggravator</u>

As a prerequisite to recommending a sentence of death, a

jury must find beyond a reasonable doubt that the defendant

> would commit criminal acts of violence that would
> constitute a continuing serious threat to society
> or that his conduct in committing the offense for
> which he stands charged was outrageously or
> wantonly vile, horrible or inhuman in that it
> involved torture, depravity of mind or an
> aggravated battery to the victim.

Code § 19.2-264.2. In this case, the Commonwealth presented

evidence on both the vileness and future dangerousness

aggravators. The jury found both aggravators were proven

beyond a reasonable doubt.

29

Teleguz claims that the trial court erred in denying his motion to strike the vileness aggravator. He argues that the evidence of vileness is insufficient because he did not commit the murder and the only evidence that can attribute vileness to him is the evidence that he instructed the perpetrators to cut Sipe's throat. According to Teleguz, this direction alone does not support a finding that the actual acts performed to accomplish the murder are attributable to him. Further, while recognizing that the issue whether the acts committed by the actual murderer can be imputed to him is "an open question," Teleguz argues that such imputation should not be allowed.

In Lewis v. Commonwealth, 267 Va. 302, 593 S.E.2d 220, cert. denied, 543 U.S. 904 (2004), the defendant was convicted of capital murder for hire of her husband. We approved the jury's finding of vileness because Lewis' actions, as the mastermind of the murder plot, constituted depravity of mind, an element satisfying the statutory definition of vileness. Id. at 316, 593 S.E.2d at 228. In Lewis, the defendant's actions included planning the murder to acquire her husband's money and life insurance proceeds, and, although he was still alive after the attack, taking his wallet from his person and waiting 45 minutes to call the police. Id. at 305-11, 316, 593 S.E.2d at 221-25, 227.

Like Lewis, Teleguz was the mastermind of the murder for hire plot. He planned the murder to avoid his responsibility of supporting his child; directed and approved the purchase of the murder weapon; took the perpetrators to the victim's home; directed the murder be committed in the apartment without regard to the well-being of his child who would likely be present; and directed the actual manner of the murder – cutting the victim's throat. Teleguz's specific directions for the manner in which Sipe was to be murdered are evidence of his depravity of mind. Furthermore, directing the manner of a murder necessarily includes knowledge of the expected physical attributes of the murder. In this case, the fatal wound was a deep stab wound to Sipe's neck which resulted in massive external and internal bleeding, causing Sipe to drown in her own blood.

Depravity of mind, as used in Code § 19.2-264.2, is "a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation." Stewart v. Commonwealth, 245 Va. 222, 245, 427 S.E.2d 394, 409, cert. denied, 510 U.S. 848 (1993) (quoting Thomas v. Commonwealth, 244 Va. 1, 25, 419 S.E.2d 606, 619-20, cert. denied, 506 U.S. 958 (1992)). The facts in this case support a finding of such depravity of mind and thus satisfy the statutory predicate of vileness. The trial court

31

therefore did not err in denying Teleguz's motion to strike the vileness statutory aggravator.

In light of this holding, we need not address Teleguz's arguments regarding whether the actions of the perpetrator can be imputed to Teleguz.

## 2. Response to Jury Question

During jury deliberations in the sentencing phase of the trial, the trial court was informed that a juror had asked the bailiff if Teleguz would have access to her identity and contact information. The trial court sent the following statement to the jury room:

> As required by law, defense counsel and the Commonwealth's attorney are provided with the name, address and occupation of each person in the venire (in this case, approximately 125 individuals). . . . As a matter of course, attorneys do not provide copies of this master list to their clients.

Teleguz claims that the trial court committed reversible error when it failed to tell the jury "that Mr. Teleguz would not have access to their personal information."

In support of this claim, Teleguz refers to the trial court's response as "improper" and "prejudicial." Teleguz also argues that the response was "factually" erroneous because the trial court "had the authority to *sua sponte* place all the information identifying the jurors under seal." At oral argument before this Court, counsel for Teleguz agreed

32

that the trial court's response was correct, and conceded that no objection had been raised at trial as to the accuracy of the statement, although an objection had been made as to the sufficiency of the response. According to Teleguz, the question posed indicated that the jury was not limiting its consideration to the evidence and the trial court's response was insufficient because it should have included an admonition to the jury to restrict their deliberations to the evidence.

Teleguz's arguments on this point have shifted throughout the course of this litigation. We do not consider the argument made in this Court that the trial court should have sua sponte placed the juror's identifying information under seal because that argument was not made in the trial court. Rule 5:25. The argument regarding the sufficiency of the trial court's response made before the trial court and in oral argument here, is not encompassed within the assignment of error and thus we do not consider it, Rule 5:17(c). Moreover, Teleguz's counsel agreed that the trial court's response was correct. Accordingly, we reject this assignment of error.

### F. POST-TRIAL ISSUES

#### 1. <u>Brady Claim</u>

A number of Teleguz's assignments of error are directed to his claim that the Commonwealth violated his due process rights under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its

progeny by suppressing material evidence that was exculpatory or could lead to exculpatory evidence.[4] The following facts are relevant to Teleguz's <u>Brady</u> violation claim. According to his written notes, Investigator Whitfield interviewed Moore on December 18, 2001, at the office of Walter Green, Moore's attorney. The handwritten notes state that the Commonwealth's Attorney, Moore, and Green signed a "proffer letter," and that Moore then stated that on the "day before" Sipe's murder he, along with Ryan Ferguson and Will Davis, were outside Moore's apartment smoking marijuana when he saw a white male with "mustache," but who was otherwise "clean shaven" leave Sipe's apartment. Moore was shown a photograph array at the interview which included Teleguz's photograph and, according to the notes, Moore identified Teleguz with 70 percent certainty "especially if he had a mustache."

Investigator Whitfield also made handwritten notes of two November 2001 interviews with Ryan Ferguson. The notes state that Ferguson saw a male who looked to be Hispanic with a goatee enter and leave Sipe's apartment on July 21, 2001. According to the notes, Ferguson was shown a photograph array which included Teleguz's photograph. At first Ferguson said

---

[4] Included in this argument on brief was an assignment of error regarding the trial court's refusal to grant a continuance following Moore's identification of Teleguz from a

none of the photographs looked like the person he saw, but then said that Teleguz's photograph looked the "most" like the person he saw, but that he was not certain. None of the handwritten notes were provided to Teleguz prior to trial.[5]

At trial, the Commonwealth showed Moore the photograph array containing Teleguz's picture. Moore testified that Investigator Whitfield had showed him this array sometime after Sipe's death and that he had identified Teleguz as the person he had seen leaving Sipe's apartment.

Following a lunch break when Teleguz had the opportunity to check his files, Teleguz objected to the admission of the photograph array and moved for a mistrial, asserting he was "surprised" by Moore's testimony and had not been provided with the photograph array. Before the trial court ruled on Teleguz's motion, Investigator Whitfield was questioned outside of the presence of the jury regarding Moore's identification from the photograph array. Investigator Whitfield testified that he had interviewed Moore "probably

photographic array. As discussed above, this assignment of error was not preserved.

[5] Prior to trial, Teleguz did receive a computer disc that contained a typed portion of Investigator Whitfield's notes from his December 18, 2001 interview with Moore. The typed document referenced a proffer letter signed by the Commonwealth's Attorney, Moore, and Green, and recited Moore's observation of an unknown male leaving Sipe's apartment on Saturday evening. This document did not refer to an identification of Teleguz from a photograph array.

two weeks" after the murder, although he could not recall the precise date without his notes. He believed the interview took place at Moore's residence and that when Moore was shown the photograph array, Moore identified Teleguz but was not 100 percent certain of the identification. Investigator Whitfield testified that he had given his notes to the Commonwealth's Attorney.

Teleguz then objected to the photograph array as "unduly suggestive," and reiterated that he had received nothing in discovery regarding Moore's identification of Teleguz, including Investigator Whitfield's notes. The trial court denied Teleguz's motion for a mistrial and admitted the photograph array into evidence. Investigator Whitfield then essentially repeated his testimony in the presence of the jury, except for certain statements regarding who was present during the interview and the photograph array.

Following completion of the guilt and penalty portions of the capital murder proceeding, Teleguz filed a motion to compel disclosure of, inter alia, any material relating to Investigator Whitfield's interviews with Moore, Ferguson, and Davis, and any proffer agreement between the Commonwealth and Moore. The trial court granted Teleguz's motion and the Commonwealth provided Teleguz with Investigator Whitfield's handwritten notes from the interviews with Moore and Ferguson.

36

The Commonwealth maintained that there were no notes from any interview with Davis and that it did not have in its possession any signed proffer agreement relating to Moore. The Commonwealth did provide Teleguz with a copy of its standard proffer agreement.

Teleguz then filed a motion asking the trial court to set aside the verdict or in the alternative to set aside the jury's recommendation of the death penalty and impose a sentence of life imprisonment pursuant to Code § 19.2-264.5, relying in part on arguments that the evidence suppressed by the Commonwealth was material and the Commonwealth's suppression denied Teleguz a fair trial. The Commonwealth, in response, asserted inter alia that Teleguz had access prior to trial to a computer disc which contained a portion of the interview with Moore including a reference to a proffer agreement but not to the photograph array identification. The Commonwealth also argued that prior to trial Teleguz had a copy of the application for a Pennsylvania search warrant dated December 14, 2001, which referred to the interview with Ferguson and Ferguson's identification of Teleguz from the photograph array. Finally, the Commonwealth argued that even if the evidence not provided was favorable to Teleguz, there was no support for the proposition that the result of the proceeding would have been different.

37

Following a hearing, the trial court denied Teleguz's motion, concluding that, even if material information had been suppressed there was no violation under Brady because there was no likelihood that the verdict would have been different. On appeal, Teleguz asserts that the trial court committed reversible error in refusing to grant a mistrial, refusing to set aside the death sentence and impose a sentence of life for good cause shown pursuant to Code § 19.2-264.5, and refusing to set aside the guilty verdict.

In Brady, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or to punishment." 373 U.S. at 87. We have recently reviewed the principles to be applied in considering whether there has been a violation of the Brady disclosure rule and its progeny:

> There are three components of a violation of the rule of disclosure first enunciated in Brady: a) The evidence not disclosed to the accused 'must be favorable to the accused, either because it is exculpatory,' or because it may be used for impeachment; b) the evidence not disclosed must have been withheld by the Commonwealth either willfully or inadvertently; and c) the accused must have been prejudiced. [Strickler v. Greene, 527 U.S. 263, 281-82 (1999).] Stated differently, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a

verdict worthy of confidence."  Kyles v. Whitley,
514 U.S. 419, 434 (1995).

Workman v. Commonwealth, 272 Va. 633, 644-45, 636 S.E.2d 368, 374 (2006).

In determining the question of materiality, we consider the suppressed evidence as a whole, not item by item and if a Brady violation is established, we do not engage in a harmless error review.  Id.; Kyles v. Whitley, 514 U.S. 419, 435–36 (1995).  Instead, a "constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial."  United States v. Bagley, 473 U.S. 667, 678 (1985); Workman, 272 Va. at 645, 363 S.E.2d at 374.

The suppressed evidence Teleguz relies on to establish a Brady violation consists of Investigator Whitfield's handwritten notes relating to his interviews with Moore and Ferguson, the photograph array used by Moore and Ferguson in the identification of Teleguz, and Moore's proffer agreement.[6] If this evidence had not been suppressed, Teleguz contends, he would not have been "surprised" when Moore testified regarding his identification of Teleguz from the photograph array; he could have used the evidence to impeach the testimony of Moore

---

[6] Teleguz identified a number of other documents which he also alleged were suppressed.  Because he does not rely on

and Investigator Whitfield with regard to Moore's identification of Teleguz as the person seen leaving Sipe's apartment prior to her murder; and the uncertainty in the identification of Teleguz by Moore and Ferguson shown in the suppressed evidence could have supported a third party perpetrator defense. Teleguz argues that this suppressed evidence was material under the standard in Kyles, because the evidence "significantly undermined the credibility of both Mr. Moore and Inv[estigator] Whitfield, as well as the overall reliability of the police investigation." Without the testimony of Moore and Investigator Whitfield, Teleguz contends "the Commonwealth's case rested entirely on unreliable and biased witnesses, such as Mr. Hetrick, a confessed murderer, Mr. Gilkes, a confessed co-conspirator, and Mr. Safanov, a career criminal, each of whom had received favorable deals in exchange for their testimony." In summary, Teleguz argues that the inability to impeach the testimony of Moore and Investigator Whitfield, the "only two supposedly unbiased witnesses," undermines the confidence in the outcome of the trial because evidence of Teleguz's guilt would then rest solely on the testimony of Gilkes, Hetrick, and Safanov.

---

these documents to establish his Brady violation claim, we do not consider or address these documents in our analysis.

40

While it is clear that Teleguz did not have the evidence at issue prior to trial, the Commonwealth argues, and the record reflects, that Teleguz did have access before the trial to the information that Investigator Whitfield had interviewed Moore in December 2001, that a proffer agreement was signed, and that Moore, along with Davis and Ferguson, had seen an unknown person coming from Sipe's apartment prior to her murder. Teleguz also had information indicating that Ferguson had been interviewed by the police and that he was shown a photograph array from which he identified Teleguz as the person he saw leaving Sipe's apartment. The Commonwealth also argues that it did not suppress any exculpatory evidence relating to Ferguson or Davis, that Teleguz had access to the photograph array at trial before Moore testified and had the opportunity to fully cross-examine Investigator Whitfield regarding Moore's identification of Teleguz from the photograph array, and finally that it did not suppress Moore's proffer agreement because it did not have such agreement in its possession.

In resolving Teleguz's Brady claim, we will assume without deciding that the evidence at issue was favorable to Teleguz and was suppressed. We nevertheless conclude that this evidence does not meet the test of materiality because its suppression does not undermine confidence in the outcome

41

of the trial.  Kyles, 514 U.S. at 434-38.  Teleguz was not charged with being the actual perpetrator of the wounds inflicted on Sipe.  Therefore, impeaching Moore's testimony regarding whether Teleguz was present at Sipe's apartment prior to her murder would not undermine the testimony regarding whether Teleguz hired others to commit the murder.[7]

Teleguz's second theory, that impeaching Investigator Whitfield's testimony would have called into question the reliability of the police investigation and in turn undermine confidence in the verdict, is equally unavailing.  The investigation that led to identifying the perpetrators and Teleguz's role in the murder was initiated by United States Deputy Marshal Nelson, not Investigator Whitfield.  In his interviews with Safanov, Deputy Marshal Nelson learned that Teleguz told Safanov he had hired someone to kill Sipe and that Teleguz was "responsible" for her death because he was angry about making child support payments.  Based on this information, Deputy Marshal Nelson located and identified Gilkes.  There is no basis to conclude that any question about the reliability of Investigator Whitfield's investigation

---

[7] Teleguz argues that Moore's testimony on this issue had to be relevant to his guilt or it would not have been admissible.  However, such testimony could be relevant to establish knowledge and familiarity with Sipe and her apartment.  Although such testimony could have been cumulative

would have impugned Deputy Marshal Nelson's investigation, which initially identified Teleguz's role in Sipe's murder and ultimately led to the confessions by Gilkes and Hetrick.

Finally, we find no merit in Teleguz's argument that the reliability of the proceeding is suspect because the only independent, and by implication credible, witnesses were Moore and Investigator Whitfield.  Neither Moore nor Investigator Whitfield testified about any independent knowledge regarding the transaction between Teleguz, Gilkes, and Hetrick. Regardless of Moore's and Investigator Whitfield's testimony and credibility, in order to return a guilty verdict, the jury had to believe the testimony of Safanov, Gilkes, and Hetrick, irrespective of their character and any "deals" they received from the government.  Accordingly, the suppression of the evidence at issue did not undermine confidence in the reliability of the outcome of the proceeding and the trial court did not err in admitting the photograph array, or in denying Teleguz's motion for a mistrial, motion to set aside the sentence of death and impose a life sentence, and motion to set aside the verdict based on an alleged Brady violation.

2.  Disqualification of Commonwealth's Attorney

---

as Teleguz argues, no such objection to its admission was made on that basis.

Teleguz assigns error to the ruling of the trial court in post-trial proceedings denying his motion to disqualify the Commonwealth's Attorney. The Commonwealth's Attorney was present at meetings between Investigator Whitfield, Ferguson, and Moore. Teleguz argues that the Commonwealth's Attorney's testimony on what transpired at these meetings was "critical" in light of the inconsistencies in the testimony of the other attendees and the questionable credibility of those witnesses. Based on his argument that the Commonwealth's Attorney was a material witness, Teleguz asserts that the trial court erred in denying his motion to disqualify the Commonwealth's Attorney and to issue a subpoena for her testimony.

Teleguz's position is based on the principle that a lawyer should not act as an advocate in an adversarial proceeding in which the lawyer is likely to be a necessary witness. Rule 3.7 of the Virginia Rules of Professional Conduct. Critical to the application of this principle is the requirement that the lawyer be a necessary witness. Sutherland v. Jagdmann, No. 3:05CV042-JRS, 2005 U.S. Dist. LEXIS 25878, at *5 (E.D. Va. Oct. 31, 2005) ("[A] party seeking to invoke the witness-advocate rule for disqualification purposes must prove that the proposed witness-advocate's testimony is strictly necessary.") (internal citations omitted). The facts of this case do not

provide that predicate. As noted above, the testimony of Ferguson and Moore regarding the identification of Teleguz is not material to the elements of the crime charged. Furthermore, Teleguz does not rely on the substance of any testimony he suggested the Commonwealth's Attorney would provide, only that it would clear up "inconsistencies" in the testimony of the others at the meeting. Adding the testimony of a fourth person may reinforce one version of the facts or add another, but would not "clear up" inconsistent testimony. Finally, any testimony by the Commonwealth's Attorney regarding the exchanges between Investigator Whitfield and Moore or Investigator Whitfield and Ferguson, would be inadmissible hearsay. Therefore, the trial court did not abuse its discretion in denying Teleguz's motion.

### 3. Subpoena for Walter Green

Teleguz assigns error to the trial court's refusal to issue a subpoena to Walter Green, Moore's attorney. Teleguz argues here, as he did in the trial court, that Green represented Moore and Ferguson in this case, and Teleguz and Sipe's mother in other matters. This concurrent representation, Teleguz argued, produced a conflict of interest, and Teleguz should have been entitled to examine Green about the conflicted representation, his role in inducing Moore and Ferguson to identify Teleguz and any

45

agreements reached with them, and the nature of any discussions with the Commonwealth.

As the trial court stated in denying Teleguz's motion, allegations of conflicting representation are based on the Rules of Professional Responsibility and are matters for the Virginia State Bar disciplinary process.  The remainder of the testimony sought by Teleguz's motion would either be inadmissible hearsay, restricted by the attorney-client privilege, or cumulative of other testimony regarding the interviews.  Accordingly, we find no error in the ruling of the trial court denying Teleguz's subpoena request.

### 4.  Use of False Evidence

Teleguz argues the Commonwealth violated his Due Process rights, pursuant to Napue v. Illinois, 360 U.S. 264 (1959), by knowingly permitting Investigator Whitfield to give false testimony.  A conviction obtained based on false testimony "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  United States v. Agurs, 427 U.S. 97, 103 (1976).  This requirement applies even where the testimony affects the witness' credibility, rather than the issue of guilt.  Napue, 360 U.S. at 269-70.  In order to find that a violation of Napue occurred in this case, we must determine first that the testimony identified by Teleguz was false, second that the

46

prosecution knew of the falsity, and finally that the falsity affected the jury's judgment. Id. at 269-71.

Teleguz identifies five statements by Investigator Whitfield which he claims meet these criteria. As an initial matter, two of these statements, Investigator Whitfield's testimony regarding who was present at the interview and the races of the other individuals whose photographs were included on the photograph array, were made during a voir dire that took place outside the presence of the jury and, therefore, could not have "affected the judgment of the jury," Napue, 360 U.S. at 271, in violation of the Due Process Clause.

We conclude that the other portions of Investigator Whitfield's testimony cited by Teleguz likewise fail to give rise to a violation of Napue. Contrary to Teleguz's argument, Investigator Whitfield did not falsely testify about the timing and location of his interview with Moore. Although a review of the record reveals some inconsistencies in Investigator Whitfield's testimony, much of his testimony, including the inconsistencies, was given in conjunction with his own qualification that he was unable to remember or that he would need to consult his notes to refresh his recollection. These statements were not false, but rather were simply statements of what he believed to be true, accompanied by a qualification that he was not certain.

47

The final two statements identified as false by Teleguz relate to Investigator Whitfield's testimony regarding the impetus for his interview with Moore. At trial, Investigator Whitfield testified that he approached Moore because he believed that Moore, as Sipe's neighbor, might have information regarding her murder, and because the police were already familiar with Moore based on previous interactions with him. Although Whitfield's testimony in a post-trial hearing was inconsistent with these statements, nothing in the record establishes that the prosecutor knew that Investigator Whitfield's trial testimony was inaccurate.[8]

As we explained above, Teleguz's guilt depended on the testimony of the Commonwealth's witnesses which established that Teleguz hired Gilkes and Hetrick to kill Sipe. Even assuming that the prosecutor knew of the alleged false testimony, there is no "reasonable likelihood" that Investigator Whitfield's testimony on the reason for interviewing Moore "could have affected the judgment of the jury." Agurs, 427 U.S. at 103.

## G. STATUTORY REVIEW

### 1. Passion and Prejudice

---

[8] While Investigator Whitfield's notes indicate the prosecutor was present at the meeting with Moore, they do not state whether the meeting took place as a result of Moore having approached the police.

Teleguz argues that the jury's recommendation to impose a sentence of death was made under the influence of passion and prejudice because of a statement made by the prosecutor in closing argument. Specifically, the prosecutor told the jury that it should find Teleguz posed a future danger and should receive the death penalty because "[a]t any time he can pick up a phone . . . and dial up a murder." According to Teleguz, this statement "pointedly instilled fear in the members of the jury for their very lives." The prejudicial effect of the statement was "greatly amplified," Teleguz asserts, by the trial court's subsequent explanation to the jury regarding Teleguz's access to the jurors' names and contact information. Finally, Teleguz argues that the Commonwealth made improper arguments designed to establish that Teleguz was a member of the "Russian Mafia" even though there was no evidence to support any such connection. These arguments, according to Teleguz, "raise the strong inference" that the jury's finding of future dangerousness and the recommendation of the death penalty were based on "passion and prejudice, not facts."

Code § 17.1-313(C)(1) requires that we consider and determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor." In conducting this review, we make an independent review of the entire record. Based on this review we

49

determine whether the record shows the existence of passion, prejudice or any other arbitrary factor and, if so, whether such elements influenced the penalty recommended by the jury.

During closing argument in the penalty phase, the Commonwealth's Attorney made the following statement:

> How would he be dangerous in prison? At any time he can pick up a phone when he has access to a phone and dial up a murder because he can call another Aleksey Safanov or another Edwin Gilkes or another Michael Hetrick. When a man can hire out a murder he can hire out a murder with a mere telephone when you have the abilities that Ivan Teleguz has shown.

Teleguz claims that this argument appealed to the jurors' passions by exciting their personal interests in protecting their safety. The statement, however, did not directly suggest any connection between the jurors and Teleguz's future criminal action. Compare, e.g., Hutchins v. Commonwealth, 220 Va. 17, 19, 255 S.E.2d 459, 460-61 (1979) (argument questioning whether the jury would suggest a sentence that would "send [a message] out to the people of Franklin County [that says] 'Come on down. It's down here. It's yours for the picking. We don't care.' "). Considering the nature of the crime of murder for hire, the Commonwealth's statement in this case is analogous to an argument in a capital murder case that a defendant should receive the death penalty because he

50

could be a future danger by replicating his crime of murder while in the prison.

Teleguz argues however, that the effect of this statement was enhanced by the prior references to a connection between Teleguz and the "Russian Mafia" and the explanation made to the jury by the trial court regarding Teleguz's access to jurors' names and contact information.

As discussed above, the record shows that at some point during jury deliberations, one of the female jurors, not necessarily the jury foreperson, asked the bailiff if Teleguz "know[s] her identity and location." Teleguz argues that the trial court's answer "endorsed the Commonwealth's inflammatory argument, thereby underscoring the jurors' explicit fear that Mr. Teleguz represented a threat to their physical safety." The jury's subsequent recommendation of the death penalty was, according to Teleguz, based on their "personal interest in their own safety and security" and thus made under the influence of passion, prejudice, or other arbitrary factor.[9]

We first note that, unlike other questions submitted to the trial court during jury deliberations in this case, the question regarding Teleguz's knowledge of jurors' names and

_____

[9] Teleguz asserted in oral argument that the jury delivered its sentencing verdict "within minutes" after it received the trial court's response. However, nothing in the

contact information was not submitted to the court in writing and was made orally by a single juror to the bailiff regarding information about her. Therefore, the record is far from clear that the jury as a whole was concerned about whether Teleguz had access to the jurors' identity or location information. Furthermore, the trial court's response to the inquiry was correct and indicated that defendants are generally not provided such information.

Finally, the fact that Teleguz could hire someone to kill another person was established by the evidence in this case; that is precisely the crime for which Teleguz was convicted. Any purported connection to the "Russian Mafia" does not change that fact. Basing a sentencing determination on an undisputed fact is not an act of passion and prejudice. The jurors, furthermore, were clearly instructed during the trial that the testimony regarding the "Russian Mafia" was solely for the purpose of showing the witnesses' state of mind, not for the truth of the matter.

Teleguz's argument rests on the premise that the prosecutor's statements injected passion and prejudice into the jury's decision making by conveying a threat to the jurors' personal safety and security. For the reasons stated

---

record indicates the time interval suggested by Teleguz, or any other time interval.

above, we conclude that the prosecutor's statements were not addressed to the jurors' safety and security, and even if that was a fair inference, the record does not support a conclusion that the jury was concerned about the issue. Even assuming that the jurors harbored sufficient concern about their safety the record does not reveal that such concern influenced their decision to recommend the death penalty.

Accordingly, after a complete review of the record, we conclude that the sentence of death was not the product of passion, prejudice, or other arbitrary factor.

## 2. Proportionality

Pursuant to Code § 17.1-313(C)(2), this Court is required to review a sentence of death in order to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." We do not conduct a proportionality review to "insure complete symmetry among all death penalty cases." Muhammad, 269 Va. at 532, 619 S.E.2d at 63 (quoting Orbe v. Commonwealth, 258 Va. 390, 405, 519 S.E.2d 808, 817 (1999), cert. denied, 529 U.S. 1113 (2000)). In conducting the proportionality review, this Court must determine whether "other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant." Lovitt v.

53

_Commonwealth_, 260 Va. 497, 518, 537 S.E.2d 866, 880 (2000), _cert. denied_, 534 U.S. 815 (2001).  The review is done to "identify and invalidate the aberrant death sentence." _Muhammad_, 269 Va. at 532, 619 S.E.2d at 63.

In conducting this review, we have examined all capital murder cases reviewed by this Court in which murder for hire was the predicate offense, where the Commonwealth sought the death penalty, and where both aggravating factors were found.  Because only a single case, _Wolfe v. Commonwealth_, 265 Va. 193, 576 S.E.2d 471, _cert. denied_, 540 U.S. 1019 (2003), involved both aggravating factors, we have also examined those cases where a sentence of death was imposed, murder for hire was the predicate offense, and only one aggravating factor was found, _Fisher v. Commonwealth_, 236 Va. 403, 374 S.E.2d 46 (1988), _cert. denied_, 490 U.S. 1028 (1989) (finding by jury of future dangerousness); _Lewis v. Commonwealth_, 267 Va. 302, 593 S.E.2d 220, _cert. denied_, 543 U.S. 904 (2004) (finding by court of vileness).  Finally, our review included those cases in which the defendant was convicted of murder for hire in violation of Code § 18.2-31(2) and received a sentence of life.  Based on this review, we find that Teleguz's sentence was neither excessive nor disproportionate to sentences imposed in capital murder cases similar to the instant case.

Teleguz argues that his sentence is disproportionate given that Hetrick, the actual killer, only received a sentence of life in prison.  This Court has stated that it will not compare the sentences received by confederates in order to determine if a sentence is excessive or disproportionate because "[t]he test is not whether a jury may have declined to recommend the death penalty in a particular case but whether generally juries in this jurisdiction impose the death sentence for conduct similar to that of the defendant."  Stamper v. Commonwealth, 220 Va. 260, 283-84, 257 S.E.2d 808, 824 (1979), cert. denied, 445 U.S. 972 (1980).  See also Lewis, 267 Va. at 313, 593 S.E.2d at 227; Murphy v. Commonwealth, 246 Va. 136, 145, 431 S.E.2d 48, 53, cert. denied, 510 U.S. 928 (1993); Thomas, 244 Va. at 26, 419 S.E.2d at 620; King, 243 Va. at 371, 416 S.E.2d at 679.  Accordingly, we reject Teleguz's argument here.

### III.  CONCLUSION

Upon review of the record and arguments presented, we find no reversible error in the judgment of the trial court. Additionally, we find no reason to commute or set aside the sentence of death.  The judgment of the trial court is accordingly affirmed.

Affirmed.

55