COURT OF APPEALS OF VIRGINIA

Present:  Judges Huff,[*] Ortiz and Raphael
Argued at Norfolk, Virginia


DANIEL RICARDO LANE ADAMS

MEMORANDUM OPINION[**] BY
v.          Record No. 2208-23-1          JUDGE STUART A. RAPHAEL
FEBRUARY 11, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
A. Bonwill Shockley, Judge

Samantha Offutt Thames, Senior Appellate Attorney (Virginia
Indigent Defense Commission, on briefs), for appellant.

Tanner M. Russo, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Daniel Ricardo Lane Adams appeals his conviction for raping a college student in her

bedroom.  Adams challenges the trial court's rulings striking one juror while seating another.  He

objects to two jury instructions that addressed the use of force and consent.  And he claims that

the prosecution failed to prove that the sex was against the victim's will or accomplished through

force, threat, or intimidation.  Finding none of those claims meritorious, we affirm his

conviction.

BACKGROUND

We recite the facts in the light most favorable to the Commonwealth, the party that

prevailed at trial.  *Camann v. Commonwealth*, 79 Va. App. 427, 431 (2024) (en banc).  "Doing

---

[*] Judge Huff participated in the hearing and decision of this case prior to the effective
date of his retirement on December 31, 2024.

[**] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

so requires that we 'discard' the defendant's evidence when it conflicts with the Commonwealth's evidence, 'regard as true all the credible evidence favorable to the Commonwealth,' and read 'all fair inferences' in the Commonwealth's favor." *Id.* (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

## A. *The incident*

In the final days of her junior year at Virginia Wesleyan University, E.R. attended an on-campus cookout hosted by a graduating senior. After consuming a few alcoholic seltzers, E.R. met Adams, who introduced himself as "DJ." Adams told her that he was a 23-year-old student at the Harvard Business School.[1] The two exchanged "Snapchat information."[2] E.R. then left the cookout to join some friends at her neighbor's house. While there, she smoked "two hits" of marijuana but did not drink any more alcohol.

When Adams appeared at that gathering, he and E.R. struck up a conversation and eventually left the party together. They walked to E.R.'s on-campus townhouse that she shared with a few housemates. Adams and E.R. engaged in consensual sex in her second-floor bedroom, but the sex was interrupted when E.R. received a FaceTime call from her sister.

After talking to her sister in the hallway, E.R. returned to the bedroom, where Adams was still in her bed. E.R. told Adams that she was not interested in intercourse. She said he could spend the night and the two could "just cuddle," "kiss," and "hold each other." The two began kissing, but Adams took things further. He got on top of E.R. and "started touching [her] body"

---

[1] Adams later told the detective who interviewed him that he was a college student at Florida International University.

[2] E.R. described Snapchat as a "communication app where you can send texts or . . . photos with text. [I]t's something that a lot of kids on college campuses use to talk to each other." Users exchange usernames, not phone numbers.

like "he was going to have sex with [her]." E.R. told him, "I don't want to have sex. I'm too tired."

Adams paused momentarily but was undeterred. He "grabbed [E.R.'s] legs harder," "pushed them open," and "pushed" his penis inside her vagina. Adams was rough and violent. He held her hands above her head in "an X shape," crossed at the wrists, while he penetrated her. At times, he choked her with one hand while squeezing her wrists together with the other. His thrusts were "so hard" that they made her head repeatedly hit the headboard. No pillow was there to cushion the blows. The intercourse was entirely different from the consensual sex before. E.R. lay frozen in fear. She "was groaning in pain," but with Adams squeezing her throat, she could not scream and could only barely breathe. Finally, after ejaculating inside her, Adams rolled over and fell asleep.

E.R. pretended to be asleep until she had a chance to escape without awakening him. She was "terrified" and "wanted to get the hell out of there." She hurried outside barefoot, encountering two friends who were returning home from studying. E.R. asked if she could stay with one of them. One friend offered her an extra room in her on-campus townhouse, and E.R. accepted. As her friend made up the guest bed, E.R., visibly shaken, revealed that she had just been raped.

E.R.'s mind was racing, and she could not sleep. She worried about having left the stranger who had just raped her alone in her bedroom. E.R. walked back to her house and told Adams to leave, telling him she "had a friend who needed [her] help." Adams asked to stay but eventually left. E.R. waited by her car in the parking lot until Adams departed. Then she walked back to her friend's house for the rest of the night. (She did not sleep in her own bed again for the rest of the semester.)

When E.R. returned home the next morning (Friday), she found "blood and semen stains" on her bedsheets. Scared from that reminder of what she had experienced, E.R. washed the sheets. When Adams tried to message E.R. "over snapchat," she blocked him and removed his contact information. But to her horror, she saw him twice that day—first at an on-campus "field day," and again at a party that she hosted with her roommates. E.R. insisted to her friends that he could not join the party, but Adams did not listen when told he could not stay. E.R. was "petrified" to see him there. Her friend testified that she had never seen E.R. look so shaken.

That Monday, E.R. reported the rape to a campus counselor. Taking the counselor's advice, E.R. went to the Chesapeake Women's Clinic for a SANE examination. Photographs from the SANE examination captured the bruises on "the outside of [her] right thigh," "right arm," and "collarbone,"[3] injuries that she did not have before the incident. E.R. reported the rape to police a few weeks later. Adams was indicted on one charge of rape in violation of Code § 18.2-61.

### B. Voir dire

During voir dire, Adams asked if any member of the venire would have "any extreme hardships" that would prevent them from sitting on the jury for multiple days. Juror 3098 raised his hand. He said he was in a probationary period at work and could miss only one day for jury service. Despite instructions on the "jury duty" form about his right to miss work, Juror 3098 was not sure if his employer would give him any additional days off. The prosecutor told Juror 3098 to assume that his employer would be understanding and then asked, "[w]ould you be able to sit here knowing that that's going on and listen to all the evidence[,] or would you be thinking about missing your job?" Juror 3098 responded, "a bit [of] both."

---

[3] The SANE examination also captured pictures of E.R.'s "face, . . . chest, . . . butt, [and] . . . vagina."

- 4 -

The Commonwealth moved to strike Juror 3098 for cause, arguing that the juror's concern about missing work would inhibit his ability to pay attention to the trial. Granting the motion over Adams's objection, the trial judge said, "it was obvious to me from his body language and stuff he doesn't want to be here."

Adams also asked during voir dire if anyone would require Adams "to give an explanation for why someone would accuse him of doing this crime." Juror 3160 spoke up, asking, "[i]sn't that the core of your job? To explain why he's not guilty?" Adams then asked, "So you would . . . need us to show that evidence?" Juror 3160 responded, "Yes."

During individual questioning, however, Adams's counsel told Juror 3160 that the judge would instruct the jury that Adams did not have to testify and that the fact he did not testify could not be considered as evidence. Juror 3160 responded that she would "follow the rules regardless of how [she] fe[lt] about it." Adams asked if Juror 3160 would look "suspiciously" at Adams if he chose not to testify. Juror 3160 first said yes. Adams then asked, assuming the defense presented no evidence but the judge told the jury that the defense did not have to present any evidence, would she be more likely to think that Adams was guilty. Juror 3160 answered no.

Juror 3160 also said that she would need "more than the alleged victim's testimony" to convict someone of rape. But during her individual questioning, the Commonwealth asked if she could "follow the law and apply that law regardless of whether or not [she] believed the law." Juror 3160 said she could.

Adams moved to strike Juror 3160 for cause, arguing that she would have difficulty setting aside her feeling that Adams should testify. The Commonwealth responded that Juror 3160 "was asked several times if she [would be] able to follow the law" and she confirmed that she could. The trial court denied the motion.[4]

---

[4] Adams later used one of his peremptory challenges to strike Juror 3160.

*C. The trial and charging conference*

E.R. testified at trial to the facts set forth above, and the Commonwealth called eight other witnesses—three of E.R.'s friends, E.R.'s sister, the campus counselor, the SANE nurse, a detective, and a forensic scientist. After the trial court denied his motion to strike, Adams called one witness in his defense, a forensic nurse, and the trial court denied Adams's renewed motion to strike.

At the charging conference, Adams objected to two of the Commonwealth's proposed jury instructions. Instruction 15 said that "a sexual act undertaken against the victim's will and without the victim's consent is an act undertaken by force." Instruction 16 said that "[t]he issue of consent concerns only the victim's state of mind. Whether the defendant intended to commit the offense without the victim's consent is not relevant. A touching that exceeds the scope of consent is unlawful." The trial court overruled Adams's objections and gave both instructions.

The jury found Adams guilty of rape, and the trial court sentenced him to 20 years' incarceration with 5 years suspended. Adams noted a timely appeal.

ANALYSIS

*A. Jury Selection (Assignment of Error I and II)*

We give deference to the trial court's decision on whether to strike a juror for cause, reviewing that decision only for "manifest error amounting to an abuse of discretion." *Barrett v. Commonwealth*, 262 Va. 823, 826 (2001). It is "manifest error" to refuse to strike a juror for cause if the juror "cannot or will not lay aside his or her preconceived opinion." *Taylor v. Commonwealth*, 67 Va. App. 448, 456 (2017). Whether a juror can be impartial is a factual question, "and the trial court's determination . . . is 'entitled to great deference on appeal' unless 'plainly wrong or unsupported by the record.'" *Northcraft v. Commonwealth*, 78 Va. App. 563, 588 (2023) (quoting *Huguely v. Commonwealth*, 63 Va. App. 92, 121 (2014)). That "deference

stems from our recognition that 'a trial judge who personally observes a juror, including the juror's tenor, tone, and general demeanor, is in a better position . . . to determine whether a particular juror should be stricken.'" *Hopson v. Commonwealth*, 52 Va. App. 144, 151 (2008) (quoting *Teleguz v. Commonwealth*, 273 Va. 458, 475 (2007)).

A trial court's decision to strike a juror for cause extends beyond striking the juror for bias. A juror may also be stricken for cause if it appears that "the juror might not give a fair and impartial trial to the Commonwealth and the accused based solely on the law and the evidence." Rule 3A:14(a)(7). The standard for "deciding whether to exclude or retain a prospective juror is whether the prospective juror's views 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Breard v. Commonwealth*, 248 Va. 68, 77 (1994) (quoting *Eaton v. Commonwealth*, 240 Va. 236, 246 (1990)).

### 1. *Juror 3098*

We find no abuse of discretion in the trial court's decision to strike Juror 3098 for cause. Juror 3098 revealed that missing work would be a distraction, affecting his ability to listen to the evidence. The trial court found that Juror 3098 did not want to participate after considering his answers, his "inflections, tone, . . . and general demeanor." *Taylor*, 67 Va. App. at 455. The court concluded that, compared to the other jurors who understood their "rights and privileges and duties," Juror 3098 didn't "want to perform the duty part." We credit that explanation and find no manifest error in the trial court's striking Juror 3098 for cause.

### 2. *Juror 3160*

While Juror 3160 presents a closer call, we cannot say that the trial court committed manifest error in declining to strike her for cause. Juror 3160 responded to defense counsel's initial questions by indicating that she would expect Adams to testify or explain his conduct if he

were innocent. But when told that the trial court would instruct the jury that Adams did not have to testify and that his not testifying could not be considered as evidence against him, she said she would not think it more likely that he was guilty if he chose not to testify. Taken together with her statements that she could follow the law as instructed, a reasonable jurist could conclude that Juror 3160 was rehabilitated and could "render a verdict based solely on the law and evidence presented at trial." *Cressell v. Commonwealth*, 32 Va. App. 744, 761 (2000).

To be sure, we have long held that prospective jurors with opinions of "fixed character" that "repel[] [a] presumption of innocence in a criminal case, and in whose mind[s] the accused stands condemned already," must be disqualified. *Brown v. Commonwealth*, 68 Va. App. 746, 785 (2018) (quoting *Justus v. Commonwealth*, 220 Va. 971, 976 (1980)). But trial courts often "discover during *voir dire* that prospective jurors have preconceived notions, opinions, or misconceptions about the criminal justice system, criminal trials and procedure, or about the particular case." *Cressell*, 32 Va. App. at 761. Indeed, it is "unrealistic to think that jurors do not notice when defendants fail to testify," so "[i]t should not be grounds for a per se exclusion . . . when prospective jurors on voir dire indicate their wants or expectations in this respect." *Townes v. Commonwealth*, 234 Va. 307, 329 (1987). The test of impartiality depends on whether a prospective juror "can lay aside the preconceived views and render a verdict based solely on the law and evidence presented at trial." *Cressell*, 32 Va. App. at 761.

The trial court could reasonably find that standard to have been satisfied here. Having personally observed Juror 3160's "tenor, tone, and general demeanor," *Hopson*, 52 Va. App. at 151 (quoting *Teleguz*, 273 Va. at 475), the trial judge was in a "superior position," *Keepers v.*

*Commonwealth*, 72 Va. App. 17, 42-43 (2020) (quoting *Green v. Commonwealth*, 262 Va. 105, 115 (2011)), to decide that Juror 3160 could properly perform her duties as a juror.[5]

### B. Jury Instructions (Assignment of Error III)

"We review jury instructions 'to see that the law has been clearly stated and that the instructions cover all issues [that] the evidence fairly raises.'" *Lawlor v. Commonwealth*, 285 Va. 187, 228 (2013) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). This presents "a mixed question of law and fact." *Id.* "It is error to give an instruction that incorrectly states the law . . . ." *Id.* "[W]hether a jury instruction accurately states the relevant law is a question of law that we review de novo." *Id.* (quoting *Orthopedic & Sports Physical Therapy Assocs., v. Summit Grp. Props., LLC*, 283 Va. 777, 782 (2012)). But an instruction is proper "'only if supported by the evidence,' and more than a scintilla of evidence is required." *Id.* (quoting *Orbe v. Commonwealth*, 258 Va. 390, 398 (1999)).

### 1. Jury Instruction 15

Adams complains that Instruction 15, which the Commonwealth adapted from our unpublished decision in *Thullah v. Commonwealth*, No. 0088-22-4, 2023 Va. App. LEXIS 114 (Feb. 21, 2023), is not proper a statement of law. Instruction 15 said that "a sexual act undertaken against the victim's will and without the victim's consent is an act undertaken by force." Adams says that courts should be cautious not to indiscriminately lift language from appellate opinions to use as jury instructions. That advice is salutary as far as it goes. But the

---

[5] We are unpersuaded by Adams's reliance on *Green*, 262 Va. at 105, and *Breeden v. Commonwealth*, 217 Va. 297 (1976). While the jurors in those cases equivocated on whether they wanted to hear the defendant testify, they either "supposed that the defendant was guilty" after reading in the newspaper that the defendant was present when the crimes occurred, *Green*, 262 Va. at 117, or thought the defendant's mere arrest was a "strong indication" of guilt, *Breeden*, 217 Va. at 298 n.*. Nothing in the record here suggests that Juror 3160 came to trial assuming that Adams was guilty.

question here is whether the instruction correctly states the law and fairly covers the issues raised by the evidence. *Miller v. Commonwealth*, 64 Va. App. 527, 547 (2015).

Instruction 15 passes that test. Indeed, our courts have consistently held that "force" in the context of sexual offenses includes both actual and constructive force. *Nelson v. Commonwealth*, 73 Va. App. 617, 624 (2021). Constructive force is established if a sexual act "was undertaken 'without the victim's consent' and 'against [the] victim's will.'" *Id.* at 625 (alteration in original) (quoting *Martin v. Commonwealth*, 272 Va. 31, 35 (2006)); *Martin*, 272 Va. at 35 (stating that lack of consent, if shown, "provides 'all the force [that] the law demands as an element of the crime'" (quoting *Bailey v. Commonwealth*, 82 Va. 107, 111 (1886))). Instruction 15 properly captured that long-standing definition.

We reject Adams's claim that Instruction 15 should not have been given because constructive force was not at issue here. The Commonwealth advocated a constructive-force theory in opposing Adams's motions to strike. The Commonwealth also argued that theory to the jury: "When one says no and someone proceeds to have sex with them, that's called rape." Because the evidence supported a constructive-force theory and Instruction 15 correctly stated the law, we find no abuse of discretion in the trial court's giving it.

*2. Jury Instruction 16*

Instruction 16 told the jury that "[t]he issue of consent concerns only the victim's state of mind. Whether the defendant intended to commit the offense without the victim's consent is not relevant. A touching that exceeds the scope of consent is unlawful." Adams reprises his concerns about basing instructions like this on language adapted from appellate opinions.

But here again, we find no error in giving the instruction because it correctly states the law. Our courts have consistently differentiated the question (1) whether the defendant intended to commit rape from (2) whether the victim "consented to sexual intercourse," emphasizing that

- 10 -

those two questions "should not be blurred." *Commonwealth v. Minor*, 267 Va. 166, 173 (2004); *see also Calokoh v. Commonwealth*, 76 Va. App. 717, 732 (2023) (holding that while Code § 19.2-271.6 permits evidence of a defendant's intellectual disability to negate intent, this sort of evidence was not meant to be considered "as it relates to the victim's consent"). The defendant need not have the specific intent "to have intercourse without the victim's consent, only the general intent . . . [to commit] the offense itself." *Gonzales v. Commonwealth*, 45 Va. App. 375, 382 (2005); *see also Clifton v. Commonwealth*, 22 Va. App. 178, 183 (1996) ("Clifton argues that rape is a crime of intent and that the Commonwealth was required to prove that he knew or should have known that the intercourse was accomplished without the victim's consent. We disagree."). In short, whether consent exists at the time of the rape "involves the victim's mental state, not the defendant's." *Gonzales*, 45 Va. App. at 382.

### C. *Sufficiency of the Evidence (Assignment of Error IV)*

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is "plainly wrong or without evidence to support it."'" *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)); *see also* Code § 8.01-680. The question is "whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Pijor*, 294 Va. at 512 (quoting *Dietz v. Commonwealth*, 294 Va. 123, 132 (2017)).

Code § 18.2-61 provides that any person having sexual intercourse "with a complaining witness . . . against the complaining witness's will, by force, threat, or intimidation . . . shall be guilty of rape." Code § 18.2-61(A). As noted above, "force" includes both actual and constructive force. *Nelson*, 73 Va. App. at 624. Actual force requires proof of more than just "the force required to accomplish" the criminal act. *Bondi v. Commonwealth*, 70 Va. App. 79,

88 (2019) (quoting *Sabol v. Commonwealth*, 37 Va. App. 9, 16 (2001)). Constructive force, by contrast, "is shown by the act of non-consensual intercourse itself." *Gonzales*, 45 Va. App. at 383.

The evidence here sufficed for the jury to find beyond a reasonable doubt that E.R. was raped through the use of both actual and constructive force. Force can be shown by "the victim's relationship to the defendant, the aggressive nature of the defendant's behavior, and the victim's fear during and after the crime." *Bondi*, 70 Va. App. at 89. E.R. testified that the sex was "rough and violent." Adams gripped E.R.'s hands in an X-shape over her head, choked her, and thrusted so hard that E.R.'s head repeatedly banged into the headboard. E.R. lay frozen in fear until it was over. She pretended to be asleep because she was afraid of what he might do next. Then she ran out of her home, barefoot and terrified. Taken together, the evidence sufficed to show that Adams used actual force to commit rape. *See Bondi*, 70 Va. App. at 90 (holding that the victim's paralytic state, "considerable physical pain," and lingering fear after the incident sufficed to establish that Bondi "accomplished the object sexual penetration by force").

The evidence amply supported a finding of constructive force as well. E.R. made clear to Adams that she did not want to have sex with him again even though she said he could stay in her room overnight, kiss, and cuddle. When he started to take it further, she repeated, "I don't want to have sex. I'm too tired." But Adams didn't listen. He pushed her legs apart and penetrated her against her will. The jury credited E.R.'s testimony that she did not consent to having sex with him a second time. His penetrating her without consent was "all the force [that] the law demands." *Martin*, 272 Va. at 35 (quoting *Bailey*, 82 Va. at 111).

CONCLUSION

We find no basis to set aside Adams's conviction.

*Affirmed.*

- 12 -