COURT OF APPEALS OF VIRGINIA

Present: Judges O'Brien, Ortiz and Lorish

DAVID T. DAULTON, ET AL.

v.      Record No. 2098-23-4

FREDERICK COUNTY DEPARTMENT OF
 SOCIAL SERVICES


DAVID T. DAULTON, ET AL.

v.      Record No. 2126-23-4

FREDERICK COUNTY DEPARTMENT OF
 SOCIAL SERVICES


DAVID T. DAULTON, ET AL.

v.      Record No. 2127-23-4

FREDERICK COUNTY DEPARTMENT OF
 SOCIAL SERVICES


DAVID T. DAULTON, ET AL.

v.      Record No. 2128-23-4

FREDERICK COUNTY DEPARTMENT OF
 SOCIAL SERVICES


DAVID T. DAULTON, ET AL.

v.      Record No. 2129-23-4

FREDERICK COUNTY DEPARTMENT OF
 SOCIAL SERVICES

MEMORANDUM OPINION[*]
PER CURIAM
MARCH 4, 2025

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

DAVID T. DAULTON, ET AL.

v.      Record No. 2130-23-4

FREDERICK COUNTY DEPARTMENT OF
  SOCIAL SERVICES


DAVID T. DAULTON, ET AL.

v.      Record No. 2131-23-4

FREDERICK COUNTY DEPARTMENT OF
  SOCIAL SERVICES


FROM THE CIRCUIT COURT OF FREDERICK COUNTY
William W. Eldridge, IV, Judge

(David T. Daulton; Jane E. Daulton, on briefs), *pro se*.  Appellants
submitting on briefs.

(Georgia Andrews; Kimberly B.W. Emerson, Guardian ad litem for
four of the incapacitated adults; Krystal A. Omps, Guardian ad litem
for one of the incapacitated adults; Ashby & Andrews, P.C.;
Struckmann, White & Wiseley PC, on brief), for appellee.  Appellee
and Guardians ad litem submitting on brief.

(Matthew L. Kreitzer; Northern Valley Law, PLC, on brief),
Guardian ad litem for two of the incapacitated adults.


David and Jane Daulton, *pro se*,[1] appeal final orders appointing the Frederick County

Department of Social Services ("Department") as the guardian of seven adult children with

diagnoses of Down Syndrome ("incapacitated adults"), whom the Daultons had adopted.  In six

of the seven cases, the Department filed petitions under Code § 64.2-2012(D) asking the trial

court to remove the Daultons as guardians and substitute the Department in their place after

receiving reports that the Daultons had abused, neglected, and financially exploited the

incapacitated adults.  In the seventh case, the Department and the Daultons both separately

---

[1] David is a disbarred attorney.

- 2 -

petitioned the trial court to be appointed as guardians of one of the incapacitated adults in the first instance. After a two-day trial, the court awarded the Department its requested relief in all seven cases.

The Daultons assign many errors on appeal related to the Department's statutory authority to serve as a guardian for an incapacitated adult, the trial court's failure to grant their motions to dismiss or their request for a continuance, and several evidentiary decisions made by the trial court. Finally, the Daultons assert that the trial court should have appointed their non-disabled adult children as guardians of the incapacitated adults instead of the Department. Because all of these arguments are either defaulted or fail to demonstrate error, we affirm the trial court's judgment.

## BACKGROUND

### I. Factual Background

In August 2017, the Circuit Court of the City of Chesapeake granted the Daultons' petitions to be appointed as guardians under Code § 64.2-2000 for their adult children: P.D., T.D.,[2] B.D., El.D., Em.D., A.D., and J.D. The orders found that the incapacitated adults had been diagnosed with Down Syndrome, were generally unable to care for themselves or manage their personal affairs, and had no assets or income other than monthly social security funds. The court granted the Daultons the authority to exercise "complete custody and control" over the incapacitated adults, consent to medical procedures, and exercise powers of attorney. Finally, the court appointed the incapacitated adults' non-disabled siblings—Michael C. Daulton, William D. Daulton, and Elizabeth D. Anderson—as "alternate Co-Guardians" if David and Jane became "unavailable,

---

[2] During the pendency of these appeals, David and Jane reached a settlement with the Department under which the guardianship of T.D. was transferred to his sister, Elizabeth Anderson. This Court therefore granted their consent motion to withdraw their appeal as to guardianship over T.D.

unable, or unwilling to" fulfill their obligations. The Daultons had two other adopted children with Down Syndrome, M.D. and M.J.D, who were minors when the 2017 guardianship orders were entered.

After the guardianship orders were entered, the family moved to Frederick County. Their new property included a "main house" and a detached "apartment." The Daultons and most of the incapacitated adults lived in the "main house," while B.D. and T.D. lived in the apartment. The primary entrance into the house was through the garage, but the "wooden ramp that [led] from the garage floor to the door" was "in poor repair and [gave] under a person's weight."

The Daultons hired caregivers who were assigned to each of the incapacitated adults. The caregivers were paid through various agencies, such as Dedicated Care Health Services ("Dedicated") and Kahak Health Care Services ("Kahak"), or paid privately by the Daultons. Generally, a caregiver assigned to one incapacitated adult "was not meant to provide care to the other[]" adults. Even so, sometimes the Daultons were absent from the home, requiring caregivers to split their time between multiple incapacitated adults.

The Daultons received $10,000 per month in Social Security funds and more than $25,000 per month "as care givers." David, specifically, was "the primary paid caregiver for [M.D.]" and billed the agency paying for her care for 56 hours per week. During the same period, however, David billed three other agencies for services allegedly provided to "his other incapacitated adult children" even though a caregiver for one adult was not supposed to simultaneously provide care to others. In addition, a review of the incapacitated adults' bank statements revealed that David transferred Social Security benefits from the incapacitated adults' bank accounts to accounts owned by him and Jane, "leaving no accounting of how the . . . Social Security funds [were] being spent."

The record shows significant, and repeated, evidence of the Daultons failing to appropriately care for the incapacitated adults and the harm that resulted to the adults in their care. Because the

Daultons do not argue on appeal that the trial court's decision was based on insufficient evidence—nor are specific financial transactions relevant to this appeal—we only briefly recount the concerning details here.

At times, living conditions in the Daultons' home were cramped. Originally, P.D. and J.D. lived in the main house's basement. In September 2022, however, mold developed after the basement flooded "a couple of times," so P.D. and J.D. moved upstairs into the home's den. The den had two doors, including a sliding door that led outside the house, and offered no privacy. P.D. and J.D. slept on a couch or on the floor in the den for nine months until their beds were moved into the den. One of the caretakers stayed in A.D. and Em.D.'s shared bedroom for a period of time, requiring them to sleep on the living room couch.

The incapacitated adults required varying levels of supervision. El.D., for example, needed one-on-one companionship at night because she would "wander about the house," indiscriminately seeking "comfort food[]" even though she had a "history of food allergies." Although an agency paid David and Jane for 56 hours per week of "overnight companion care" for El.D., David admitted "to sleeping during the overnight hours that he was billing for providing" that care to El.D. in violation of Medicaid rules and policy.

The Daultons and their various caregivers were aware of repeated inappropriate interactions between B.D. and his siblings, especially M.J.D., whom he referred to as his "girlfriend." B.D. often tried to kiss M.J.D., put her on his lap, and do "inappropriate things" with her. Following multiple incidents between B.D. and M.J.D., the Daultons met with a behaviorist who created a "behavior plan" for B.D. that required constant "one-on-one supervision" and the installation of doorway alarms. Yet the behavioral plan was not followed, and further incidents between B.D. and M.J.D. occurred. The Daultons were aware of such incidents but did not report them.

On May 26, 2023, Ramona Dobbs, an adult protective services worker for the Department, met with the Daultons. The Daultons admitted that a caregiver had reported B.D.'s abuse of M.J.D. to them. The Daultons minimized the incidents but admitted that they failed to abide by the behavioral plan created for B.D. by not securing constant supervision and turning off the door alarms. Dedicated and Kahak conducted investigations following incidents of inappropriate sexual behavior from B.D. directed at M.J.D. Both agencies found that the Daultons had failed to adhere to B.D.'s behavioral plan and violated agency policies and regulations. In July 2023, both agencies stopped providing services to the Daultons.

On August 1, 2023, Department employees visited the Daultons' home while six of the nine incapacitated adults were present with only two supervising adults, neither of whom was agency staff. B.D. had an infected eye and a leg wound. During a return visit three days later, B.D. was by himself in the apartment, his eye was "swollen shut," and his leg wound, while healed, "look[ed] as if it [was] going to reopen at any time." The "entire house had an odor of urine," and "mold, drywall dust, and sewage" were in the basement. Cat litter was spread across the home's floor, and cat feces were under the couch in the foyer.

On August 10 and 11, 2023, the Department sent the Daultons letters informing them that they had been "identified as . . . alleged perpetrator[s]" for "willfully neglecting the . . . incapacitated adults in [their] home," "failing to provide safe and stable housing" for the incapacitated adults, and "failing to provide supervision of [B.D.]," thus "creating a danger to all members of the household." The letters outlined various allegations of neglect and abuse as they related to each of the incapacitated adults, including financial exploitation of the Social Security income.

On August 11, 2023, the incapacitated adults were removed from the Daultons' home and placed with various caretakers. The caretakers noted poor health and hygiene in the incapacitated adults, including open wounds, bleeding gums, unclean bodies, stained clothing, and matted hair.

II. Procedural History

In July 2023, upon petition by the Department, the guardianship cases for P.D., B.D., El.D., Em.D., A.D., and J.D. were reinstated on the court's active docket and venue was transferred to the trial court. Around the same time, the Daultons, *pro se*, petitioned the trial court to be appointed as M.D.'s guardians under Code § 64.2-2000. The Department responded by filing a cross-petition to be appointed as M.D.'s guardian.[3]

Once the cases were transferred, the Department petitioned the trial court to name it as the incapacitated adults' guardians under Code § 64.2-2012(D).[4] The Department's motions recited that Jane and David Daulton had been "criminally charged with neglect" and that the Department had "multiple open cases regarding the Daulton family, including two of the adults sleeping on the floor, suspected sexual assault in the home, protective measures not being followed, removing [M.J.D.] from the home, alleged financial exploitation and mismanagement of funds." The Department concluded that the Daultons "were not providing the necessary care and supervision of the incapacitated adults" and moved the trial court to appoint the Department as their temporary guardian.[5]

---

[3] This litigation does not encompass proceedings related to M.J.D.

[4] The Department served notice on each of the incapacitated adults, including M.D., of the pending guardianship proceeding, which included the required statement regarding the potential legal consequences.

[5] Following the above motions, the trial court appointed guardians ad litem to represent the incapacitated adults. Matthew Kreitzer was appointed to represent P.D. and J.D. Krystal Omps was appointed to represent B.D. Kimberly Emerson was appointed to represent M.D., A.D., Em.D., and El.D.

The trial court entered a pretrial order setting the cases for a two-day trial beginning October 11, 2023. The order required the parties to submit "objections to exhibits" to the opposing party and trial court "within 5 days of [the exhibit's] submission, or they will be deemed waived." The order also noted that "[a]ny exhibits filed and not objected to in writing will be admitted at trial."

On August 30, 2023, the Daultons, *pro se*, filed two motions to dismiss. The first motion to dismiss argued that the guardianship petition failed to meet statutory requirements. In addition to alleging various procedural deficiencies, the motion argued that as a "public agency," the Department "may not serve as Guardian of an incapacitated adult" since it was "not approved by the DARS [Department of Adult Rehabilitative Services of Virginia] regulations for a private guardianship service."

The second motion sought to dismiss allegations of sexual assault that appeared in the Department's petition because the allegations were unsupported or disputed by an eyewitness. Additionally, the Daultons insisted that "[t]o allow" the Department to investigate the allegations, which resulted in a "'finding' of sexual assault," violated their constitutional rights. They maintained that, to protect their due process rights, the Department should have referred the matter to law enforcement to determine whether criminal charges were appropriate.

The trial court scheduled the motions to be heard on October 5, 2023.

On September 20, 2023, the Department filed its witness and exhibit lists with the trial court and served copies on the Daultons and the guardians ad litem. Attached to the exhibit list were 23 exhibits that the Department intended to introduce at trial, which included notes and reports compiled by adult protective services investigators; reports from Kahak that the Daultons had exploited the incapacitated adults and committed human rights violations; pictures of the Daultons' home, including the incapacitated adults' living arrangements; account statements

from the Daultons' bank accounts; and the Department's written conclusions about which reports of abuse were "founded," "unfounded," or "invalid."  The Daultons did not file written objections to any of the exhibits as required by the pretrial order.

On September 21, 2023, David, by newly retained counsel, and Jane, *pro se*, moved the trial court to continue the "pre-trial conference and deadlines."  The motions asserted that the Daultons had hoped that David's new counsel could represent both of them, but she could not because of "ongoing criminal investigations and possible felony charges" against David.  Thus, David's new counsel sought additional time to prepare for the pretrial conference and trial, to request and complete discovery requests, and to "produce witnesses and exhibits as set forth in the pre-trial order"; she also moved for a continuance of the trial until after the criminal matters were resolved, so that David could testify at trial without fear of incriminating himself.  Jane, *pro se*, requested "a continuance for basically the same reasons."

After the October 5, 2023 hearing,[6] the trial court denied the Daultons' motion to continue, finding no "good cause to continue this matter."  The trial court also denied the Daultons' motion to dismiss "for reasons stated on the record."  Finally, the court stated that there were "no due process violations" prohibiting the case from being heard as scheduled.

In a separate order, the trial court denied another motion to dismiss "based on due process violations" raised during oral argument at the October 5, 2023 hearing.  Although the order did not recount the details of the Daultons' oral due process argument, the trial court found that the due process rights at issue were those of the "incapacitated individuals," all of whom were represented by guardians ad litem.  Moreover, those guardians ad litem had represented that the incapacitated adults had received notice under the statute.

---

[6] The record does not include a transcript or written statement of facts from this hearing.

III.  Trial Proceedings

At the beginning of the two-day trial, David, by counsel, renewed a motion to dismiss, arguing that the alternative guardians under the 2017 Chesapeake orders—Elizabeth D. Anderson, William Daulton, and Michael Daulton (the Daultons' non-disabled, adult children)— were entitled to notice of the proceedings under Code § 64.2-2004.  The Department countered that the non-disabled, adult siblings were not appointed as "standby guardians" under Code § 64.2-2013, which requires adherence to "certain procedures," nor was there any evidence that they were parties in the Chesapeake proceedings.  The Department also contended that it was moving under Code § 64.2-2012 to substitute one guardian for another, not to expand the scope of the guardianships, so notice was unnecessary.

In considering the motion, the trial court called Anderson as a witness.  Anderson testified that she and the other non-disabled siblings had been aware of the proceedings "for a while."  All three of them also knew about the trial date.  Relying in part on that testimony, the trial court denied the motion.  The trial court found that the three siblings had actual notice of the proceedings and "had the opportunity to intervene," as David and Jane had.  The court also found that David and Jane were the actual guardians entitled to notice and that until David and Jane became "unwilling, unable, or unavailable," the non-disabled siblings were not guardians and therefore not entitled to notice.  In any event, the trial court also found the Department was not trying to expand the scope of the guardianships but to replace the guardians.  Thus, the court concluded that the siblings were not entitled to notice under Code § 64.2-2004(B) because that provision applied only when a petition sought to expand the scope of a guardianship.

After the trial court denied the motion to dismiss, the Department moved to admit the 23 exhibits it had submitted to the court.  David objected but admitted that "there were no objections filed within five days of the submission of the exhibits," as required by the pretrial

- 10 -

order. David continued with arguments on the admissibility of the Department's exhibits, citing hearsay, irrelevance, and inaccuracy. The trial court allowed the objection to be put on the record but clarified that it was "not considering anything that's being said" because "there were no objections made pursuant to the pretrial order," and thus "all of the Department's exhibits are deemed admitted." The court also emphasized that during the hearing the previous week, it had "denied the motion to continue for the reasons previously sta[t]ed on the record."

During trial, Anderson, the Daulton's fifth child, testified on their behalf. By 2017, Anderson was no longer living in the Daultons' home but saw her parents and siblings, including the incapacitated adults, about once a month. Anderson testified that her siblings were "happy" and "well cared for," and denied that the house was unsafe or smelled of mold or urine. Anderson was unaware of any "inappropriate behavior" between B.D. and his siblings.

Anderson stated that "if [her] father and mother [lost] their guardianship role of [her] siblings," she and her two brothers "would be co-guardians." But she was generally unaware of the "roles and responsibilities of a guardian." She understood that the Chesapeake Circuit Court had appointed her to be a guardian only if her parents were "unwilling, unable, or unavailable." Anderson had been contacted by an adult protective services worker in July 2023 who explained the upcoming court proceedings and "asked her about being interested in becoming the [g]uardian" for the incapacitated adults. At the time, Anderson expressed tentative interest in becoming guardian for some, but not all, of the adults, and said she had been served with the notices. That said, she never filed any pleadings seeking to become the guardian of any of the incapacitated adults.

At trial, multiple witnesses testified positively regarding the Daulton family. Christina White, B.D.'s caregiver from 2021 to 2023, testified that David was "[a] loving and caring

- 11 -

father."  Several family friends testified to the loving nature of the Daulton family, describing their "love and patience" and "beautiful" home.

After the close of the evidence and argument by counsel, the trial court took the matters under advisement and continued proceedings to November 1, 2023, to give an "oral ruling from the bench."  After the November 1, 2023 hearing,[7] the trial court entered final orders substituting the Department as the incapacitated adults' guardian and appointed the Department as M.D.'s guardian in the first instance.  The court found by clear and convincing evidence that the Daultons had not acted in the "best interests" of the incapacitated adults and were "no longer suitable to serve" as their guardians.  The Daultons appeal.

ANALYSIS

I.  Motion to Dismiss

The Daultons first argue that the trial court erred by denying their motion to dismiss because there is no "statutory authority" that permits the Department to "act as a private [g]uardian" for an incapacitated adult.  They contend that under Code § 64.2-2000, only (1) a person, (2) "a local or regional program designated . . . as a public guardian," or (3) a "local or regional tax-exempt charitable organization" can serve as a guardian.  They concede that the Department could be a temporary guardian under Code § 63.2-1609 but contend that the statute does not grant the Department the authority to be "a permanent or long[-]term" guardian.[8]  We disagree.

---

[7] The record does not include a transcript or written statement of facts from the November 1, 2023 hearing.

[8] The Daultons' first assignment of error also contends that the trial court erred by denying their motion to dismiss "based on the lack of proper [n]otice," though the assignment of error does not specify who was allegedly entitled to "proper [n]otice" and did not receive it. Regardless, their brief does not present any argument regarding notice under the first assignment of error; instead, their argument focuses solely on the alleged lack of statutory authority for the Department to serve as a permanent guardian to the incapacitated adults.  Thus, any argument regarding notice under the first assignment of error is waived.  *See* Rule 5A:20(e); *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017).

Issues of statutory construction are reviewed de novo. *Coxcom v. Fairfax Cnty.*, 301 Va. 201, 208 (2022). "When the language of a statute is unambiguous, we are bound by its plain meaning." *Taylor v. Commonwealth*, 298 Va. 336, 341 (2020) (quoting *Conyers v. Martial Arts World of Richmond, Inc.*, 273 Va. 96, 104 (2007)). In addition, "[s]tatutes which have the same general or common purpose or are parts of the same general plan are . . . ordinarily considered as *in pari materia*." *Briet v. Mason*, 59 Va. App. 322, 335-36 (2011) (second alteration in original) (quoting *Andrews v. Creacey*, 56 Va. App. 606, 617 (2010)). They "must be construed 'together in order to give full meaning, force, and effect to each.'" *Id.* at 335 (quoting *Antisdel v. Ashby*, 279 Va. 42, 48 (2010)). "We accord each statute, insofar as possible, a meaning that does not conflict with the other statutes." *Boynton v. Kilgore*, 271 Va. 220, 229 (2006) (quoting *Ragan v. Woodcroft Village Apts.*, 255 Va. 322, 325 (1998)).

Title 64.2, subtitle IV, Part D of the Code of Virginia provides the statutory framework governing "Guardianship[s] of Incapacitated Persons." Under that framework, a "[g]uardian" is defined as

> a person appointed by the court who has the powers and duties set out in § 64.2-2019 . . . and who is responsible for the personal affairs of an incapacitated person, including responsibility for making decisions regarding the person's support, care, health, safety, habilitation, education, therapeutic treatment, and, if not inconsistent with an order of involuntary admission, residence.

Code § 64.2-2000. The definition provides that the term guardian "*includes*" any "local or regional program designated by the Department for Aging and Rehabilitative Services as a public guardian," or "any . . . tax-exempt charitable organization . . . [under] § 501(c)(3) of the Internal Revenue Code to provide guardian services to incapacitated persons." *Id.* (emphasis added). In addition, Code § 64.2-2002(A) provides that "[a]ny person, *including* a community services board and *any other local or state governmental agency*, may file a petition for the appointment of a guardian, a conservator, or both." (Emphases added).

- 13 -

Reading the above statutes together demonstrates that a "person" under the guardianship statutes *includes* local or state governmental agencies, like the Department of Social Services, and that any such "person" can be a "guardian" under Code § 64.2-2000. That conclusion accords with Code § 1-230, which defines "[p]erson" as "any individual, corporation, partnership, association, cooperative, limited liability company, trust, joint venture, *government*, *political subdivision*, or *any other legal or commercial entity* and any successor, representative, agent, agency, or instrumentality thereof." (Emphases added).

Accordingly, we decline to adopt the Daultons' narrow definition of "guardian." Code § 64.2-2000's definition explicitly states that a guardian "includes" certain specifically identified organizations, but nothing in that definition *limits* who can be a guardian to those specific organizations. Indeed, "the word 'include' in a statute generally 'implies that the provided list of parts or components is *not* exhaustive and, thus, not exclusive." *City of Emporia v. Cnty. of Greensville*, 81 Va. App. 28, 39 (2024) (emphasis added) (quoting *Auer v. Commonwealth*, 46 Va. App. 637, 645 (2005)). That is especially true when the statute contains "no limiting language . . . that suggests the word is used in a restrictive manner." *Id.* Here, Code § 64.2-2000 contains no limiting language suggesting that we must adopt the narrow interpretation of "guardian" that the Daultons advance. Thus, the Department may be appointed as the guardian for an incapacitated adult, and the trial court did not err in denying the Daultons' motion to dismiss.

II. Motion for a Continuance

The Daultons argue that the trial court erred in denying their motion for a continuance filed by "their newly acquired legal counsel."[9] They contend that the denial of the motion

_____

[9] Although the Daultons' joint brief alleges that the newly retained counsel was "their[s]," the record demonstrates that counsel represented David only and that Jane proceeded *pro se* below.

- 14 -

deprived them of "adequate time" to litigate the cases. We cannot review this argument, however, because the record does not include a transcript or written statement of facts from the hearing at which the motion to continue was litigated and decided.

"On appeal, we presume the judgment of the trial court is correct." *Bay v. Commonwealth*, 60 Va. App. 520, 528 (2012). The appellant bears the burden "to present to us a sufficient record from which we can determine whether the trial court has erred in the respect alleged" by appellant. *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 285 n.2 (2022) (quoting *Bay*, 60 Va. App. at 528). Generally, "[t]he transcript of any proceeding is a part of the record when it is filed in the office of the clerk of the trial court no later than 60 days after entry of the final judgment." Rule 5A:8(a). "When the appellant fails to ensure that the record contains transcripts or a written statement of facts necessary to permit resolution of appellate issues, any assignments of error affected by such omission will not be considered." Rule 5A:8(b)(4)(ii). "If . . . the transcript [or statement of facts] is indispensable to the determination of the case, then the requirements for making the transcript [or statement of facts] a part of the record on appeal must be strictly adhered to." *Veldhuis v. Abboushi*, 77 Va. App. 599, 606-07 (2023) (alterations in original) (quoting *Bay*, 60 Va. App. at 528). "Whether the record is sufficiently complete to permit our review on appeal is a question of law." *Bay*, 60 Va. App. at 529.

Additionally, "[t]he decision to grant a motion for a continuance is within the sound discretion of the circuit court and must be considered in view of the circumstances unique to each case." *Haugen v. Shenandoah Valley Dep't of Soc. Servs.*, 274 Va. 27, 34 (2007). "The circuit court's ruling on a motion for a continuance will be rejected on appeal only upon a showing of abuse of discretion *and* resulting prejudice to the movant." *Id.*

The Daultons bore the burden to present a sufficient record on this issue, and they failed to do so. Although the trial court entered its orders on November 1, 2023, we granted the

- 15 -

Daultons an extension until February 1, 2024, to file the transcripts. The Daultons filed transcripts of the two-day trial on January 29, 2024. But they did not file a transcript of the October 5, 2023 motions hearing during which the trial court considered and ruled on their motion to continue the cases, nor did they file a transcript of the November 1, 2023 hearing at which the trial court provided its oral ruling from the bench.

We cannot review the Daultons' continuance argument without a transcript of the October 5, 2023 hearing. The trial court's order denying the motion to continue after that hearing summarily found that the Daultons had failed to prove "good cause" to justify the continuance, as required by the pretrial order. *See Reaves v. Tucker*, 67 Va. App. 719, 734 (2017) (affirming the trial court's denial of a continuance when the party failed to demonstrate "good cause" as required by the court's pretrial scheduling order). Then, during the trial a week later, the trial court explicitly stated that it had denied the motion for a continuance "for *various* reasons . . . previously sta[t]ed on the record." Without a transcript of the October 5, 2023 hearing wherein the trial court stated those reasons, and wherein the Daultons presented any evidence and argument regarding their motion to continue, we cannot review the trial court's finding that the Daultons failed to prove good cause.[10] *See Reeves*, 67 Va. App. at 734 (finding that "'good cause' simply means 'the burden placed on a litigant (usu[ally] by court rule or order) to show why a request should be granted or an action excused" (alteration in original) (quoting *Good Cause*, *Black's Law Dictionary* (10th ed. 2014))). Nor can we determine whether the Daultons were actually prejudiced by the denial of their motion, or even whether their arguments on appeal address all of the "various" reasons why the trial court denied the motion. *See Johnson v. Commonwealth*, 45 Va. App. 113, 116 (2005) (holding that,

---

[10] Although, without a transcript, we cannot determine the reasons that the Daultons advanced as demonstrating "good cause," the record reveals that when the newly retained counsel filed her motion for a continuance, she still had four days to object to the Department's filed exhibit list under the pretrial order.

"in 'situations in which there is one or more alternative holdings on an issue,' the appellant's 'failure to address one of the holdings results in a waiver of any claim of error with respect to the court's decision on that issue'" (quoting *United States v. Hatchett*, 245 F.3d 625, 644-45 (7th Cir. 2001))). Accordingly, the Daultons' arguments are waived. *See* Rule 5A:8(b)(4)(ii).

III. The Department's Exhibits

The Daultons argue that the trial court erred in admitting and relying on the Department's 23 exhibits. They contend that many of the exhibits contained unsupported "allegations" that they neglected and abused the incapacitated adults based on nothing more than "hearsay." Additionally, they contend that many of the allegations contained in the exhibits were irrelevant as they did not relate to "any of the legal duties or responsibilities" of guardians under Code § 64.2-2019 and "were basically complaints about the level of or absence of care-giving these incapacitated adults were receiving." The Daultons devote much of their brief to addressing individual exhibits and explaining why, in their view, the exhibits were not relevant to "any Legal Guardianship duties."[11]

---

[11] The Daultons further argue that the "allegations" contained within the Department's exhibits "were a violation" of their due process rights because the Department determined that the allegations were "founded" without referring the matters to the local police even though they pertained to criminal matters, and without affording them certain constitutional rights, like the right to confront their accusers, during the Department's investigation. As a threshold matter, many of the alleged constitutional rights the Daultons assert were violated, such as the right to confrontation, apply "only in criminal trials," not the Department's internal investigations. *Henderson v. Commonwealth*, 285 Va. 318, 325 (2013). Regardless, to the extent that the Daultons attempt to collaterally challenge the Department's conclusions that certain reports of abuse were "founded," they cannot do so in the context of these proceedings on the petitions to substitute the incapacitated adults' guardians. Indeed, whether the Department followed all applicable policies and statutes when investigating the reports of abuse in this case is irrelevant to the question of whether the trial court erred in finding that the Daultons had not acted in the incapacitated adults' "best interests" under Code § 64.2-2012(D).

The Daultons also assigned error to the court's failure to grant their motion to dismiss various "allegations" from the Department's petition based on purported "due process violations." The court considered this motion during the October 5, 2023 hearing, for which the record does not include a transcript or written statement of facts. *See* Rule 5A:8(b)(4)(ii). The trial court's order denying their motion states only, "there are no due process violations as to why this matter cannot be heard" as originally scheduled. Otherwise, it denied the

- 17 -

Yet we do not consider the Daultons' various arguments for why the trial court erred by admitting and considering the Department's exhibits because they do not address the trial court's actual ruling: that the Daultons' evidentiary objections were waived because they did not timely and properly object under the pretrial order.

We "do not consider" assignments of error that "do not address a ruling made by the trial court." *Teleguz v. Commonwealth*, 273 Va. 458, 471 (2007). Indeed, an appellant's arguments are "waived" when they failed to address the actual "basis upon which" the trial court made its ruling. *Martin v. Lahti*, 295 Va. 77, 88-89 (2018). Litigants may not recast a trial court's ruling and seek reversal on that reframed issue while avoiding the actual basis and ground of the underlying judgment. *See id.*; *Teleguz*, 273 Va. at 471.

At trial, the Daultons' various objections to the exhibits were waived because they failed to timely and properly object pursuant to the pretrial order. Consistent with the pretrial order's direction that "[a]ny exhibits filed and not objected to in writing will be admitted at trial," the trial court admitted each of the Department's previously filed exhibits without qualification or condition. *See Cooper v. Commonwealth*, 54 Va. App. 558, 574 n.6 (2009) (explaining that hearsay evidence "'admitted without objection' . . . may 'properly be considered' and 'given its natural probative effect'" (quoting *Baughan v. Commonwealth*, 206 Va. 28, 31 (1965))). Because the Daultons'

---

Daultons' motion to dismiss "for reasons stated on the record." Without a transcript of the hearing that contains those reasons and that outlines the nature of the Daultons' due process arguments presented below, we cannot determine whether the trial court's judgment was in error. *See* Rule 5A:8(b)(4)(ii). In any event, the Daultons provided no legal analysis or authority to support the argument that the court was required (or even permitted) to dismiss allegations from a guardianship petition. Rule 5A:20.

various appellate arguments challenging the admission of the Department's exhibits do not address the actual basis of the trial court's ruling, we do not consider them on appeal.[12]

IV. The Daultons' Exhibits

The Daultons argue that the trial court erred in "not allowing the admission" of their exhibits despite admitting the Department's. They contend that the disparate rulings evince a "double standard," as David's attorney properly submitted his witness and exhibit lists within the time limits established in the trial court's October 10, 2023 order. The Daultons argue that, although they complied with the pretrial order, the trial court "denied the admission" of their exhibits into evidence because neither David nor Jane "took the stand to introduce them formally." We reject this argument because the Daultons never properly attempted to admit any exhibits into evidence.

David chose not to testify in this case because of his pending criminal charges. As a result, he was unable to lay a foundation for the photos and videos that he sought to introduce. Through counsel, he attempted to summarize the evidence he would have sought to admit in the case had he testified. While summarizing the hypothetical evidence, David asserted that there were "three videos" he would have introduced "if he were *allowed* to testify." (Emphasis added). The trial court immediately interrupted David to clarify that it had not in any way ruled that he could not

_____

[12] In places, the Daultons' *pro se* brief seems to challenge the sufficiency of the evidence to conclude that they were not acting in the incapacitated adults' "best interests" under Code § 64.2-2012(D). They argue, for example, that the evidence failed to prove that their actions "r[ose] to the level of Adult Abuse." They assert that the evidence demonstrated only that they did not meet the Department's "arbitrary" and "subjective" standards and opinions. They explicitly contest that the Department's evidence was "true" and, in any event, argue that the evidence demonstrated only that the Department "was concerned about the risk of POSSIBLE harm," not actual harm. To the extent the Daultons' brief argues that the evidence was insufficient to demonstrate that they had not acted in the incapacitated adults' best interests, we do not consider those arguments because they are not within the scope of any of their assignments of error. *See Riddick v. Commonwealth*, 72 Va. App. 132, 146 (2020) (holding that we "cannot 'consider issues touched upon by [the appellant]'s argument but not encompassed by his assignment of error'" because "we are 'limited to reviewing the assignments of error presented by the litigant'" (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 289, 290 (2017))).

testify and that to suggest otherwise was inappropriate. David then continued to summarize the evidence he would have attempted to introduce.[13]

After David finished summarizing the hypothetical exhibits, the trial court found that there was nothing for it to rule on as David had not actually sought to admit any exhibits into evidence. Instead, David had chosen not to testify and thus not to seek admission of any exhibits. Consequently, the court "made no determination" regarding admission of the exhibits because nobody "asked . . . properly for admission." David, by counsel, agreed with the trial court that he had not actually moved the exhibits to be introduced into evidence. Thus, the Daultons' argument that the trial court erred by "den[ying] the admission" of his exhibits into evidence is waived because it does not address an actual ruling of the trial court. *Teleguz*, 273 Va. at 471.

V. The Non-Disabled Siblings as Alternate Guardians

The Daultons argue that the trial court erred by denying "standing and ultimately [g]uardianship to the alternate [c]o-[g]uardians already appointed in the" 2017 Chesapeake orders. The Daultons contend that their non-disabled adult children were "appointed as [a]lternate [g]uardians" and, therefore, should have "automatically" become the new guardians.[14] However, we cannot consider this argument, as it is unsupported by any legal analysis or authority and therefore waived under Rule 5A:20(e).

An opening brief must contain "[t]he standard of review and the argument (including principles of law and authorities) relating to each assignment of error." Rule 5A:20(e).

---

[13] Jane did not testify or mention any exhibits she wanted to introduce.

[14] The Daultons maintain this position, asking this Court to thrust legal rights and obligations on the non-disabled siblings even though all three of them were aware of the proceedings and did not intervene. Indeed, Anderson's testimony was, at best, equivocal on whether she would serve as a guardian for even *some* of the incapacitated adults. And she told Dobbs that she decided not to intervene in deference to her parents. Moreover, neither of the other two non-disabled siblings appeared before the court or ever asked to be appointed as guardians even though they were aware of the proceedings.

"Unsupported assertions of error 'do not merit appellate consideration.'" *Bartley v. Commonwealth*, 67 Va. App. 740, 744 (2017) (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008), *aff'd in part, vacated in part*, 279 Va. 52 (2010)). "[I]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her." *Id.* at 746 (quoting *Sneed v. Bd. of Prof'l Resp. of the Sup. Ct. of Tenn.*, 301 S.W.3d 603, 615 (Tenn. 2010)). To the contrary, if an appellant believes "that the trial court erred, Rule 5A:20(e) require[s] him 'to present that error to us with legal authority to support [his] contention.'" *Id.* (second alteration in original) (quoting *Fadness v. Fadness*, 52 Va. App. 833, 851 (2008)). Consistent with those principles, we have held that a litigant's failure to comply with Rule 5A:20(e) waived his argument when he made "one reference" to a single case and failed to support his argument "with any legal analysis or authority from [that case] or any other source." *Id.* at 745. Such a "skeletal" argument left this Court without a "legal prism through which to view [the] alleged error."[15] *Id.* at 746 (quoting *Sneed*, 301 S.W.3d at 615).

The Daultons cite two cases providing what they view as the standard of review. Their argument mentions concepts addressed in the various guardianship statutes, but it does not cite those statutes or any other authority supporting the assertions of error. Nor does the argument cite any legal authorities addressing standing in the context of guardianship proceedings or cite legal authority to explain why the trial court abused its discretion in not automatically appointing the non-disabled siblings as guardians under the 2017 orders. Without any citations to legal authorities supporting their position, the Daultons leave this Court without a legal prism through

---

[15] A *pro se* litigant "is no less bound by the rules of procedure and substantive law than a defendant represented by counsel." *Townes v. Commonwealth*, 234 Va. 307, 319 (1987) (quoting *Church v. Commonwealth*, 230 Va. 208, 213 (1985)). *See also Francis v. Francis*, 30 Va. App. 584, 591 (1999) ("Even *pro se* litigants must comply with the rules of court.").

which to view their alleged error. This Court will not construct their case for them on this issue. Thus, the argument is waived.

VI. Scope of Witness Testimony

Finally, the Daultons argue that the trial court erred by limiting the testimony of their witnesses to events that occurred after 2017, the year they became the guardians of the incapacitated adults. They contend that evidence of their long-standing "devotion to their children" was "very relevant to the issues before the [c]ourt," in part because it undermined the Department's evidence attacking their character. But the Daultons did not present that specific argument to the trial court, so the argument is not preserved.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "Rule 5A:18 requires a litigant to make timely and specific objections, so that the trial court has 'an opportunity to rule intelligently on the issues presented, thus avoiding unnecessary appeals and reversals.'" *Brown v. Commonwealth*, 279 Va. 210, 217 (2010) (quoting *West v. Commonwealth*, 43 Va. App. 327, 337 (2004)). "Specificity and timeliness undergird the contemporaneous-objection rule [and] animate its highly practical purpose." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019). "Not just any objection will do. It must be both *specific* and *timely*—so that the trial judge would know the particular point being made in time to do something about it." *Id.* (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)).

Throughout the two-day trial, the court repeatedly reminded the parties that the issue before the court was whether the Daultons had acted in the incapacitated adults' "best interests" under Code § 64.2-2012(D) since becoming their guardians in 2017. The court asked the parties to focus their evidence on events occurring "from 2017 to present." David initially objected to

that limitation, contending that evidence of events and circumstances before 2017 was relevant to determining whether the Daultons "continuously ignore[d] urgent situations" related to the incapacitated adults' medical conditions as alleged. The trial court clarified that witnesses could give "a little background information" to establish their relationship with the Daultons but that the only evidence relevant under the statute was "what has occurred since the point . . . that [the Daultons] were appointed guardians" in 2017.

Despite the narrowness of David's objection at trial, the Daultons broadly argue on appeal that evidence about their general "devotion to their children" was relevant to all of the "issues" before the court because it countered the Department's attacks on their character. Still, David did not present that broader argument to the trial court. Instead, he objected only that evidence of circumstances before 2017 was relevant to determining whether the incapacitated adults' medical issues were long-standing or newly developed issues that required urgent care. "Making one specific argument on an issue does not preserve a separate legal point on the same issue for review." *Edwards v. Commonwealth*, 41 Va. App. 752, 760 (2003) (en banc). Nor did Jane present any objection to the trial court's ruling. As a result, the argument is not preserved for either appellant.[16] The Daultons did not invoke Rule 5A:18's exceptions in their opening

---

[16] In addition, the record demonstrates that the trial court permitted the Daultons to introduce extensive evidence regarding their character and devotion to their family. For example, White testified that David was a "loving and caring father." Cynthia Petrich described the Daultons as a "beautiful family" that "love[d] one another." Another family friend, Wendy O'Rourke, testified that the Daultons were an "incredible family." O'Rourke described the Daultons as "loving, caring, patient parents." Maurice Hilliard also testified that the Daultons had a "beautiful home" with lots of "land" compared to where they lived in Chesapeake. Given the extensive evidence demonstrating the Daultons' love and "devotion" to the incapacitated adults, any error in the trial court not allowing more of the same evidence was harmless. *See Commonwealth v. Proffitt*, 292 Va. 626, 634 (2016); *McLean v. Commonwealth*, 32 Va. App. 200, 211 (2000).

brief, and we will not do so sua sponte. *Id.* at 761.[17]  Thus, Rule 5A:18 bars our consideration of

this argument on appeal.

CONCLUSION

For all these reasons, the trial court's judgment is affirmed.

*Affirmed.*

---

[17] Although the Daultons invoke the ends of justice exception in their reply brief, we do not consider non-jurisdictional arguments raised for the first time in a reply brief.  *Palmer v. Atlantic Coast Pipeline, LLC*, 293 Va. 573, 580 (2017).